## Staples v. Commonwealth.

(Decided December 18, 1917.)

### Appeal from Warren Circuit Court.

1.  Criminal Law—One Assaulted in Own Residence—Self-Defense.—
    The rule that one assaulted in his own residence need not avail

himself of a safe or apparently safe means of escape in order to avert the impending danger of an assault by the deceased does not apply where the homicide occurs upon premises of the defendant other than his residence and appurtenance, and to which the deceased was invited.

2.   Criminal Law—Safe Means of Escape.—The word "apparently" in describing the safe means of escape of which the defendant must take advantage in order to avail himself of the right of self-defense is not synonymous with the word "reasonably," as applied to the same means of escape, and it is not error to require the defendant to avail himself of apparently safe means of escape before he can exercise the right of self-defense.

FRANKLIN RIHERD and SIMS, RODES & SIMS for appellant.

CHARLES II. MORRIS, Attorney General, and HENRY F. TURNER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellant, Staples, on January 13, 1917, in his store in Bowling Green, Kentucky, killed N. Welch by striking him twice on the head with an ax, one lick being on the right side of the head just above the ear and the other on the back of the head. Each lick crushed the skull of deceased, producing his death within a couple of hours, he never having regained consciousness after the infliction of the wounds upon him. The grand jury of Warren county indicted appellant, charging him with the crime of murder, and upon his trial the jury convicted him of voluntary manslaughter, fixing his punishment at confinement in the penitentiary for nine years. To reverse that judgment he prosecutes this appeal.

The only grounds for a reversal of the judgment are, (1) that the evidence is insufficient to authorize a conviction, and (2) error of the court in framing the self-defense instruction. The record is exceptionally free from contradictions, the testimony of both sides as to the facts leading up to and following the assault being practically the same. The facts as testified to are substantially these: Defendant was a merchant in Bowling Green, Kentucky, and some time in December, 1916, he entered into a written contract with the deceased whereby he agreed to purchase from the latter a residence in that city, agreeing to pay therefor a lien debt thereon amounting to $2,290.60, which was owing for purchase money, and in addition the sum of $1,000.00 to be paid in goods to be taken out of defendant's store. On Decem-

ber 22, the deceased prepared a deed to defendant and
had it signed and acknowledged by both himself and his
wife in which it was recited that the consideration was
"One dollar cash in hand paid, the receipt of which is
hereby acknowledged," and the assumption by the de-
fendant of the indebtedness mentioned.  Upon presenta-
tion of this deed defendant raised the point that there
was omitted therefrom as part of the consideration the
one thousand dollars' worth of goods, but it was ex-
plained to him both by the defendant and the county court
clerk of Warren county that this was immaterial, it being
competent to show what the actual consideration was,
and that the actual consideration, omitted from the deed,
would not interfere with the parties carrying out their
contract as agreed to.  In the meantime, the thousand
dollars' worth of goods had been taken from the shelves
of defendant's store and boxed, ready to be delivered
to the deceased.  Some time after the delivery of the deed,
and after it was recorded, defendant still not appearing
to understand or to be able to reconcile the difference be-
tween the recitations in the deed and the contract, he
was informed by the deceased that there was no longer
any necessity for the contract, since the deed would take
the place of it, whereupon defendant insisted upon can-
celing the contract and wrote upon it the words, "null
and void," and signed his name thereunder.  At the same
time he asked deceased to also sign his name, but instead
of doing so, the latter put the contract in the stove and
burned it.  After this was done defendant declined to de-
liver or permit deceased to take any of the goods upon the
ground, as he insisted, that the deed had been substituted
for the contract and it stated as the consideration other
than the assumption of the indebtedness the payment of
one dollar, the receipt of which was acknowledged, in-
stead of the payment of one thousand dollars' worth of
goods, which was the actual contract.  After some fruit-
less efforts to explain the matter to defendant, deceased
filed suit against him to recover damage for a failure to
comply with the contract, and procured an injunction
preventing him from disposing of the property until
the suit could be heard and determined.

The filing of the suit seems to have agitated and dis-
turbed the defendant no little, and he wrote two postal
cards to the deceased, who lived at Glasgow, Kentucky,
asking him to come to Bowling Green, and see if a set-
tlement of the matters could be effected, and it was in
response to these requests that deceased was in Bowling

Green on the day he met his death.  On that day he went into defendant's store the first time about six o'clock in the morning and several different times after that, and each time would mention the matter.  Propositions and counter-propositions were made until finally the parties agreed upon terms of settlement except as to an item of $34.00 cost, which deceased insisted upon defendant's paying, and which he declined to do, and it became apparent that no settlement could be made.  At this juncture the defendant stated to the deceased that he had a writing there which if they had settled the case he intended to show to deceased, but inasmuch as they had not settled it, he would show it to him anyway, and he thereupon delivered to the deceased a pencil tablet, in which there had been written, on January 8 preceding, several pages of matter somewhat rambling in its nature, but consisting chiefly in bewailing the fact that he had made the trade for the Bowling Green property at a price which he considered exorbitant and at a time when he was perhaps not financially able to do so.  There was also interspersed in it much abuse of the deceased, and it further contained a statement of the contract between the parties.  There are other matters found in that writing somewhat indicating that defendant was laboring under some great trouble and contemplated doing something out of the ordinary, which may be found in that part of the writing addressed to his daughter Nora, who is now Mrs. Riherd, and lives in Florida.  Deceased, at the request of defendant, took the writing to the hotel, where he was stopping, with the promise that he would return it, and about 4 o'clock of that afternoon he did return to the store, but declined to return to defendant the writing, presumably upon the ground that it contained an acknowledgment of the true contract between the parties, and would be serviceable to the deceased in the trial of his law suit.  The parties then got into a scuffle over the possession of the writing, and a witness for the Commonwealth, who was in the store, and who ran a livery barn just across the street, disappeared.  In about ten or fifteen minutes that witness returned to the store and heard groans, which, upon investigation, he learned were being made by the deceased, who was lying on the floor between the counter some fifteen or twenty feet back from the front door, his face down, resting upon his left arm, his head crushed as stated, but there was no other person in the store.  Immediately the alarm was given, a crowd assembled, and someone

found an ax leaning against some object about three or four feet from the body of deceased. It was a two-edge ax and upon its side was blood and some gray hair corresponding to that of deceased. There was no evidence of any scuffle of any character having taken place, although the spot was surrounded by boxes, barrels and other such articles as are usually kept in a store of that character. Within a little while other groans were heard, and a search by a policeman revealed the fact that there was someone hanging by his neck in the cellar or basement under the store. As soon as the body could be reached by the policeman he found that it was the defendant. There was a bale of rope there and one end of it was tied around his neck and thrown over the braces of the sills of the store floor forming the ceiling of the basement. By the side of his feet was a rock upon which he is presumed to have stood when he tied the rope so as to hang himself. He was taken down and carried to the jail, and about the only words he spoke to the policeman, aside from giving the name of the deceased, were: "He has some papers of mine, and I wish you would get them."

Two witnesses testified that deceased on his way from Glasgow to Bowling Green stated to them that he was going to get "goods, money or blood." There is also testimony in the record that he was a man of violent and perhaps turbulent temper. The defendant, after telling about the controversy over the possession of the penciled tablet papers, in explaining why he struck deceased, says: "I started to get the sack of flour and Mr. Welch came right along after me and when I started in between the counters he says, 'Now, Mr. Staples, what are you going to do about this?' and I says, 'There is not but one thing to do, and let the court settle this, and that is all I am going to do about it,' and he throwed his hand under his coat and made about two steps and I backed back I guess about two steps and the ax was sitting against the counter and I hit at him with one hand, this way, with it, and I struck back this way with it, and that is all I know." He then says the licks were struck with both of his hands using the ax, and that deceased as he approached defendant said, "If you don't settle this suit I'll fix you," and that he remembers nothing more from that time until he regained consciousness at the jail; that he does not know from whence or how he procured the rope with which he hung himself, nor how he got into the cellar, nor any fact connected with that transaction.

His testimony upon the whole, however, is reasonably intelligent and rationally connected, and he urges no excuse for the assault except that of self-defense. His attorneys introduced witnesses who were acquainted with and knew him for a number of years, and they testify that at least upon occasions he would act in an irrational manner, and this testimony, together with the rambling nature of the writing referred to forms the basis of the insanity plea.

Under these facts, the first insistence of defendant's counsel is made, it being bottomed upon the idea not that the evidence shows the defendant to have been insane, but that it fails to show that he did not commit the assault in his necessary self-defense, i. e., that the evidence as a whole shows conclusively that the killing was done in self-defense. With this we are unable to agree. It is true, if we take the statements of the defendant alone as to how the transaction occurred, unmodified by circumstances and conclusions to be drawn from other evidence in the record, he establishes his plea. But his story is somewhat improbable, and in some of its features unnatural. Moreover, no weapon of any character was found on deceased, not even a pocketknife. The location of the wounds, together with the fact of their being more than one, would tend to refute defendant's story as to how the killing occurred. There is also the extremely improbable and almost unbelieveable story about defendant's mind entirely fading away after the deed was committed. Evidently one of two things is true, viz., that the defendant was crazy or he was seeking to avoid capture and consequent punishment by his effort to end his own life. There are also expressions in the writing to which we have referred indicating that defendant was going to commit some terrible deed for which he desired forgiveness from the members of his family or from the Powers Above, or both, and the jury had the right to determine what deed he had in mind when he wrote those statements, which were written after the deceased had sued him. The jury had the right to consider all of these facts and circumstances, and we are clearly of the opinion that it would have been improper not to permit them to do so.

The self-defense instruction complained of is number four given by the court, and is in these words: "If the jury believe from the evidence that at the time defendant struck and killed Welch, he believed in good faith and had reasonable grounds to believe that he was

then and there in danger of death or of great bodily harm at the hands of said Welch, and there appeared to defendant in the exercise of a reasonable judgment no other safe or apparently safe means of averting the impending danger, if any there was, then the defendant had the right to strike and kill said Welch, and the jury will acquit him on the grounds of self-defense or apparent necessity.''

The criticism of this instruction is leveled at this clause contained therein, ''and there appeared to defendant in the exercise of a reasonable judgment no other safe or apparently safe means of averting the impending danger,'' it being insisted that this qualifying clause should not have been inserted in the instruction under the facts of this case, and in support of this contention we are referred to the cases of Bledsoe v. Comlth., 9 Ky. Law Rep. 1002; Tingle v. Comlth., 11 Ky. Law Rep. 224; Estep v. Comlth., 86 Ky. 39; Baker v. Comlth., 93 Ky. 302, and other like cases.

In the cases referred to substantially the same clause, qualifying the right of self-defense so as to require the defendant to avail himself of safe or *apparently safe* means of escape before killing the deceased in order to justify it upon the ground of self-defense, was inserted in the self-defense instruction, and this court disapproved it upon the ground that under the facts of those cases no such requirement should be exacted of the defendant. In all of the cases, except, perhaps, the Tingle case, the killing was done at the residence of the defendant, and this court, in giving the reason for its disapproval in the Bledsoe case, said: ''Evidently the jury may from it (the objectionable clause) have believed that if flight would have afforded him (defendant) a safe or apparently safe means of avoiding any existing danger at the hands of the deceased, that then the accused, although he may have been the party assailed, was bound to flee. The law did not require him to leave his own premises. He was at his own home. If there assailed and thereby put in danger of loss of life or great bodily harm, he had a right to use such means as were reasonably necessary to his protection, even to the extent of taking life. While in such a case he could, of course, resort to no unreasonable or unnecessary force, yet he was not required to leave his own premises and flee, but could stand his ground and strike in his necessary self-defense. The doctrine of safe or apparent safe means of escape does not apply in such a case. One is never required to de-

sert his own home or flee from his own premises to avoid an assailant.''

In the Tingle case the killing did not occur in the defendant's residence, but in his business house, but it did not appear that the deceased had any other right to be in defendant's business house except that arising from the implied invitation or permission which one who engages in business extends to all members of the public. Nor did it appear that defendant's place of business was not located on premises adjacent or appurtenant to his dwelling. In the instant case the deceased not only had such impied permission from the defendant, but, as we have seen, he was expressly invited on two previous occasions to be there. As long as the doctrine of the cases referred to is confind and applied to instances where the killing occurs in the residence or home of the defendant, it is in perfect accord with the principles of the common law as ancient as the right of self-defense itself to the effect that ''The house of every one is to him as his castle and fortress, as well for his defense against injury and violence, as for his repose.'' Coke.

We think it would be extending the rule too far to apply it in all cases where the killing occurs upon the *property* of the defendant other than his residence, and, perhaps, adjacent premises, especially when the deceased was expressly invited by the defendant to be there. Indeed, in the more recent case of Greer v. Commonwealth, 164 Ky., 396, this court declined to apply the rule and approved of this clause in the self-defense instruction, ''and as it then appeared to him (defendant) there was no other safe means or *apparently* safe means of avoiding said danger, either real or apparent, except to shoot the said Charley Troutman,'' etc., although the homicide in that case was committed at the defendant's office, which is the same in law as a place of business. The same insistence was made in that case as is made here, but the court in disposing of it said:

''The instruction on self-defense required, in order to render the killing of Troutman excusable, that there should have been no other safe or apparently safe means of avoiding the danger at his hands. Appellant contends that the jury may have understood by this that if he could have averted the danger by leaving the office, it was his duty to do so; and that for this reason the instruction is erroneous and prejudicial, because, as appellant claims, being on his own premises he was under no duty to retreat when attacked.

"The former rule was that the person assailed, in order that the killing of his assailant might be excusable, must have availed himself of the opportunity to escape if such there was, and have slain his assailant only as a last resort; but the modern rule in Kentucky is that whether he should stand his ground or give back is a question for the jury to determine under an instruction declaring apparent necessity a legal excuse for the homicide and the measure and only test of his right to, slay his assailant.

"Nor do we find any good reason why any distinction should be made between homicides occurring *on the premises* of the slayer under the circumstances here shown, and those occurring elsewhere, especially where the assailant commits no trespass in going or remaining thereon."

Under the circumstances of this case the reason for the rule contended for as applicable to one's residence does not exist, and to extend it so as to apply to cases where the killing occurs upon defendant's land or premises other than his residence and appurtenances to which the deceased has been invited would have a tendency to license many cruel and needless homicides, and that, too, without any justifiable excuse in law or necessity for the protection of one's home, and we do not feel authorized to give our sanction to the extension of the rule as herein contended for. It should be sparingly applied so as to confine it strictly within the reasons for its adoption; and when the court in some of the cases cited refers to defendant's home, "or premises," the latter expression should be construed to refer only to the premises adjacent and appurtenant to the home and forming a part of it.

The next criticism of the same instruction lies in the use of the word "apparently" qualifying the clause "safe means of averting the impending danger," it being contended that this word should have been entirely omitted from the instruction, and in support of this we are referred to the case of Thompkins v. Comlth., 117 Ky. 138, in which the adverb "reasonably" was used in the instruction instead of the word "apparently," as used in the criticised instruction. In order to make that case applicable here it is argued that the words "reasonably" and "apparently" are synonymous, or that the latter word is even more restrictive of defendant's rights of self-defense than the former one, but we are unable to agree with this contention. If the defendant is re-

quired to take advantage of a "reasonably safe means of escape," it might be, as argued in the Thompkins case, that the "means of escape" might not certainly possess any of the qualities of being *safe,* but only *reasonably,* so while "apparently safe means of escape" does not dispense with the requirement that the means shall be and remain safe, but also requires that such safe means, should be *apparent* to the defendant. The use of the word "apparently" in the same connection in which it is found in the criticised instruction has many times been approved by this court, Connor v. Commonwealth, 118 Ky. 497; Greer v. Commonwealth, *supra,* and the cases hereinbefore cited by defendant, which do not disapprove of the use of the word "apparently" in the modifying clause of the self-defense instruction, but, on the contrary, approve of its use in that connection; the only disapproval by them being that the *clause* in which that word is used in the self-defense instruction, where the killing occurred at the home of the defendant, should be omitted.

In Roberson on Kentucky Criminal Law & Procedure, vol. 1, sec. 163, in stating the law upon the subject in this Commonwealth, it is said: "The rule in Kentucky is stated thus: If one without fault believes, and has reasonable grounds to believe, that another is about to take his life, or do him great bodily harm, and he has no other *apparent* safe means of securing himself from the impending danger, he may take the life of the other, and is excusable upon the ground of self-defense and apparent necessity." We, therefore, conclude that neither of the criticisms made of the self-defense instruction given in this case is meritorious.

With the exception of the points discussed, the trial seems to be exceptionally free from error; the entire law of the case was given to the jury, including an instruction upon insanity. Unless the defendant was insane, or acted in his necessary self-defense, the killing was a most inexcusable homicide. The jury determined from testimony authorizing it and under correct instructions that neither of the defenses was available to the defendant, and under the well-recognized rule governing criminal practice, we are not authorized to disturb that finding. If it should subsequently develop that the defendant is actually insane, the law affords him a remedy, but it is not for us to say, under the condition of the record, that the jury decided the issues wrongfully against him.

Wherefore, the judgment is affirmed.