## Pace v. Commonwealth.

(Decided June 2, 1916.)

### Appeal from Barren Circuit Court.

1. Criminal Law—Trial—Questions for Jury—Review.—In a prosecution for murder, where the evidence showed that defendant and another were the only persons who saw or were present when the homicide occurred; that defendant was under legal arrest by the deceased, an officer; that the homicide occurred in an altercation growing out of the demand by the third person and defendant for the release of the latter from custody; and that defendant at least did nothing to prevent the shooting of deceased or the kicking and abuse of his person by such person after he was shot, it was for the jury to determine whether the homicide was, as claimed by defendant, accidental, or whether defendant was guilty of committing or aiding in the killing of deceased, and this court will not say, on appeal, that the verdict finding him guilty of voluntary manslaughter was unsupported by or flagrantly against the evidence.

2. Criminal Law—Evidence—When Not Sufficient to Establish Conspiracy.—Where the only competent evidence on the subject merely showed that defendant and another were together for several hours before the homicide, the only persons present when it was committed, and that they remained together for a time

afterwards and gave no information of the homicide to others; there was nothing to establish the conspiracy alleged in the in- dictment, and it was error for the trial court to instruct the jury on that question.

3. Criminal Law—Conspiracy—When Instruction on Prejudicial.— It was prejudicial error for the trial court to instruct the jury on the question of conspiracy, even though such instruction applied only to the crime of murder and defendant was found guilty of voluntary manslaughter, since the instruction was calculated to magnify the prosecution in the minds of the jury.

4. Criminal Law—Evidence—Declaration by Third Person—When Not Admissible.—It was prejudicial error of the trial court to ad- mit testimony as to a statement of a third person that "Milt says if Thurman come to arrest him * * * he was going to kill him," such statement referring to the person indicted with defendant for the homicide and being calculated to establish defendant's knowledge of the intention to commit it, where there is nothing to show that defendant or the person to whom the threat was as- cribed heard the statement or that it was made under such cir- cumstances as would call for a response from defendant.

W. L. PORTER, C. H. HATCHETT, H. T. ARTERBERRY and CLEM HUGGINS for appellant.

M. M. LOGAN, Attorney General, and CHARLES H. MORRIS, As- sistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Reversing.

The appellant, Louis Pace, was separately tried and convicted of voluntary manslaughter under an indict- ment jointly charging him and one Milt Mansfield with the murder of Bob Thurman, a police officer of the city of Glasgow; his punishment being fixed by the verdict of the jury at confinement in the penitentiary not less than eight nor more than twenty-one years. From the judgment entered upon the verdict he prosecutes this appeal.

There were several counts in the indictment, the first charging a conspiracy between Mansfield and Pace to commit the murder, and its joint commission by them in pursuance of such conspiracy. In the subsequent counts each is charged with the commission of the crime of murder as principal and the other as being present, aiding, abetting and assisting in its commission. Mans- field was first tried under the indictment resulting in his conviction of the crime of murder, the verdict and judg- ment fixing his punishment at confinement in the pen- itentiary for life. On appeal the judgment was affirmed,

the opinion being reported in 163 Kentucky Reports, at page 488.

Robert Thurman, the deceased, was known to be a fearless officer who had for a number of years served as marshal or policeman in various cities of the State other than Glasgow, and in the latter city had shown himself especially vigilant in suppressing the illegal sale of whiskey. The salient facts leading to and resulting in the homicide are as follows: About 10:30 o'clock on the night of September 18, 1914, Thurman was called up by telephone at the Murrell Hotel by Alex Abston, a boy, who, by direction of Richard Chism, requested him to go to the latter's house on Page's Heights and arrest the appellant, Louis Pace, for disorderly conduct. When the telephone message reached the hotel, Thurman, who was a boarder there, had retired for the night, but upon being advised by Hatcher, the hotel clerk, of the telephone message, he immediately got up, and, putting on his clothing, except his coat, went directly to Chism's residence. When Chism sent the Abston boy to call Thurman over the telephone, the appellant, Pace and Milt Mansfield were both at his house, as was Mary Chism, a daughter of Richard Chism. Mansfield and Pace had whiskey in their possession, of which they and Chism and his daughter had been drinking. Pace, being greatly intoxicated, had thrown himself upon a bed in Chism's house, which act and his refusal to get up from the bed and leave the premises, gave offense to Chism and caused the latter to have the officer telephoned to come and arrest him. Neither the appellant nor Mansfield saw or heard Chism direct the Abston boy to telephone Thurman to come and make the arrest. Mansfield left the Chism residence shortly before the arrival there of Thurman and was not present when the latter reached the house. Before Mansfield left, however, Mary Chism said to Tobe Archer, a boy who was at the Chism house, "Milt (Mansfield) says if Thurman come to arrest him, God damn him, he was going to kill him." When this statement was made, Mary Chism was standing about the middle of the porch in front of the open door leading into the room and the appellant Pace and Mansfield were, standing about the middle of the room.

Upon Thurman's arrival he arrested the appellant Pace, took him from the house and started toward the

town with him, walking a few feet in his rear. When they had gotten a short distance from Chism's house Mansfield came up behind them, overtook them and had some conversation with Thurman, followed by a pistol shot, which entered Thurman's left side about five and a half inches below the nipple, passed through the body, came out near the spinal column on the opposite side, at a point two inches lower than the point of entrance. Thurman's clothing and flesh were powder burned to the size of a silver dollar surrounding the entrance of the bullet, indicating that the pistol must have been against or very close to his body when the shot was fired. Upon receiving the wound, Thurman fell upon his left side in the gutter or street. Immediately following the shot the persons in houses on either side of the street looked out from their homes to ascertain what had occurred. There were also three or more persons standing on the public square, about 200 or 250 feet from the scene of the homicide, who heard the shot and shortly thereafter went to the place of the shooting. Some of the inmates of the adjacent houses testified that they saw the form of a man lying in the street near the pavement and two men dressed as the appellant, Pace, and Mansfield admittedly were that night, were standing over and one of them cursing and abusing the one lying in the street. One of them was seen to get off the pavement and kick Thurman several times, in doing which he was overheard to make such remarks as the following: "Nobody can hit me over the head and get away with it. Let the son of a b—— die hard, die like a dog. Die, you damn son of a b——, die." Mrs. Merriman, one of the witnesses seeing the kicking and hearing the statements, called out to the men not to kill Thurman, but did not know either of the men at the time or that Thurman was the man lying in the street. Ray Hurt, a boy fourteen years of age, heard one of the men say, "I told you if you ever tried to arrest me or followed me I would kill you." Immediately thereafter Mansfield and the appellant, Pace, left the scene of the homicide and were met by the three men who were on the public square two hundred or more feet away when the shot was fired, as they were on their way to the place of the killing. Thurman was taken by friends to the Murrell Hotel, where he died in a few minutes, without making any statement whatever.

The facts thus far stated were furnished by the evidence introduced in behalf of the Commonwealth; it being the contention of the Commonwealth that these facts show that Mansfield and Pace or one of them, aided and assisted by the other, took Thurman's pistol from him and with it shot him. Upon the other hand, the appellant, Pace, testified, in which he was corroborated by Mansfield, who was brought from the penitentiary at Eddyville to be introduced as a witness, that he and Mansfield got together about half past six o'clock in front of the Glasgow Times office, where appellant was engaged as an employe of the office; that they then went to the depot and got a lunch and there met Biner Wilson, from whom Pace procured two pints of whiskey. After getting the whiskey Pace and Mansfield sat down on the railroad back of Dickerson's warehouse and there drank of the whiskey and talked for two or three hours. Mansfield then proposed that they go up to Chism's to get some clothing which had there been washed for him; that they then went to Chism's and with Chism and his daughter, Mary, drank more of the whiskey and ate a watermelon, during which time they sat around and talked. Mansfield left before Pace and before the arrival of Thurman, and testified that when he got to the corner of the block he walked through some screenings from an engine, which water from the engine had converted into a slushy place; that in walking through the soft place the screenings got into his shoes, to remove which he sat down in an alleyway or shaded street, took his shoes off and removed the screenings therefrom, upon concluding which he saw Thurman coming along with the appellant Pace in charge. After they passed him he left the alley or street and followed along until he overtook them. Upon reaching them he said to Pace, "Hello, what is the trouble, Louis?" to which the latter replied: "Mr. Thurman has got me arrested and says he is going to put me in jail." Thereupon Mansfield said: "Mr. Thurman, he lives right back here, let me take him home, and if there is any fine to pay, Louis is a man and will come down and pay it." Following this statement from Mansfield, Thurman he said, looked him in the eye, and answered: "No, I will not let you take him home, I will take you, you son of a b——." Mansfield further testified that Thurman then reached out and grabbed him, pulled him close to

him and struck him in the head with the butt of his pistol; that Thurman then held the barrel of the pistol in his hand and when he struck Mansfield with the butt that the force of the blow caused the pistol to be discharged, the bullet taking effect in Thurman's body, as previously described. The blow which Mansfield claimed to have received from the pistol was on the left side of his head and made a gash or wound about an inch long and a half inch deep. The wound bled profusely.

The appellant, Pace, was not as definite as Mansfield in his statements as to what occurred at the time of the shooting. He, however, claimed to have seen Thurman strike Mansfield with the pistol and testified that the blow was accompanied or instantly followed by the shot which caused Thurman to fall to the street. Both Mansfield and Pace denied that either of them kicked or cursed Thurman after he fell to the street. According to their further testimony, they went from the scene of the killing to the Foster Hotel, which they entered at the back entrance and went up to the room of Morris Botts, where Mansfield exchanged his bloody shirt for a clean blue shirt of the same color as the one he took off, borrowed of Botts. After exchanging shirts, Mansfield or Botts rolled up the bloody shirt in an old newspaper and left it on the floor of the room, where it was found the next morning. Both Mansfield and Pace then left the Foster Hotel and went to the courthouse steps, where they sat down and with Carleton Collins drank of the whiskey which Pace had. While they were sitting there, people passed discussing the homicide, but they said nothing about it. Among others who came along was Trigg, the sheriff, who asked them whether they had seen one, Jess Whitmey. Shortly thereafter they went to their homes, Mansfield going by the Childers house to get his coat, which he left there earlier in the night. Mansfield and Pace were arrested on the following morning, the former being at his home and Pace at the printing office where he had gone to begin work for the day.

The testimony of the witnesses for the Commonwealth who saw Thurman kicked after he was shot and heard the exclamations made at the time, while strongly conducing to prove that the accompanying statements or exclamations were made by the person who did the kicking, were unable to identify either of the two men

standing over Thurman as he lay in the street. One of these witnesses, Mrs. Merriman, said she had known the appellant Pace for years, was familiar with his voice, and that the exclamations accompanying the kicking of Thurman were not, in her opinion, made by Pace; and she, the boy Ray Hurt and one or two other witnesses, agreed in the statement that the man who did the kicking and indulged in abuse of Thurman was without a coat, and it appears from much of the other testimony in the case that Pace was then wearing a coat, but that Mansfield was without one.. Charles Merriman, the husband of Mrs. Merriman, who was with his wife on their porch immediately after the pistol was fired, heard the man in the dark suit say, "Better get a doctor." Tom Cartwright and his wife, two of the persons who were attracted to their door by the pistol shot and who had known the appellant Pace fifteen or seventeen years, testified that the cursing and the talking done at the time of the kicking of Thurman were not in his voice.

A number of experts were introduced—gunsmiths and others familiar with the Smith & Wesson make of pistol, like the one with which Thurman was shot—some of whom testified that such a blow as Mansfield claimed was given him on the head by Thurman with the pistol, would not have discharged the weapon; while others testified with equal positiveness that it was possible and altogether probable that the pistol could have been discharged in that way. In addition to the evidence mentioned, twenty-two witnesses were introduced as to the character of the appellant Pace, who had known him all his life and all of whom testified that he was thirty-one years of age, had worked as a compositor in the Glasgow Times office for more than fifteen years; that he was a quiet, peaceable, orderly citizen, and that his reputation for peace, amiability and good order was as good as that of any man in the community; that he had never before been charged with a crime and that though addicted to the habit of intoxication, even when drunk, he was always peaceable and good humored.

It will be seen from the foregoing outline of appellant's evidence that his defense was based upon the ground that the death of Thurman was an accident, resulting from his own act in striking Mansfield with his pistol, and that in no event did he, appellant, aid or abet

Mansfield in anything that he may have done to cause the death of Thurman.

One of the grounds strongly urged by appellant's counsel for a reversal of the judgment of conviction is that the verdict is unsupported by and flagrantly against the evidence and that the trial court erred in refusing the peremptory instruction directing a verdict of not guilty, requested by him at the conclusion of the evidence. The contention as to the peremptory instruction rests, of course, upon the theory that there was no evidence to authorize or support the verdict. It is a recognized rule in this jurisdiction that if, on appeal, it be found that the evidence contained in the record, though conflicting, was sufficient to warrant the submission of the case to the jury, that fact will prevent the reversal of the judgment on the ground that the defendant's acquittal should have been directed by a peremptory instruction. It is only in the absence of any evidence tending to establish the guilt of the accused that the trial court will be authorized to grant a peremptory instruction directing his acquittal. In other words, the verdict of the jury on conflicting evidence, as to the cause or circumstances of a homicide, is, as to the question whether a peremptory instruction should have been given, conclusive on review. Carter v. Commonwealth, 130 Ky. 240; Lewis v. Commonwealth, 29 R. 820; Tompkins v. Commonwealth, 28 R. 642. Here the evidence showed that appellant and Mansfield were the only persons present when the homicide occurred; that Thurman was killed by a pistol shot while he had appellant under arrest for drunkenness, which arrest the intoxicated condition of the latter authorized him to make without a warrant; and that the shooting of the officer occurred in an altercation between him and Mansfield growing out of the demand of Mansfield and appellant for appellant's release from custody by the officer. The jury may have concluded from this evidence that appellant's desire to be released from arrest furnished a motive for his assisting Mansfield in shooting Thurman, and though the abuse and kicking of the latter after he was shot may have been, as much of the evidence conduced to prove, from Mansfield alone, the fact that appellant made no attempt to restrain or prevent such abuse and kicking on the part of Mansfield, they also had the right to consider in determining whether he was aiding or

abetting the latter in the killing of the officer. It is true that Mansfield's testimony was wholly to the effect that the killing of Thurman was caused by his own act in producing the discharge of the pistol by striking him with it, and that appellant's testimony in so far as he professed to have any knowledge of the killing, corroborated that of Mansfield; but it was the province of the jury to determine from the evidence as a whole whether the homicide could have resulted accidentally as claimed by appellant and Mansfield, and we do not feel authorized to say that the verdict at which they arrived was unsupported by the evidence, or that it was flagrantly, i. e. palpably, against the evidence.

Appellant's complaint of instruction No. 2 defining what constitutes a conspiracy and in what state of case the jury might find that the killing of Thurman resulted from a conspiracy between appellant and Mansfield, must be sustained. The only competent evidence introduced to establish the alleged conspiracy were the mere facts that they were together for several hours before the shooting of Thurman; the only persons present when he was shot, and that they remained together for a time subsequent to the shooting and gave no information thereof to others. This evidence was insufficient to establish the alleged conspiracy. It is true a conspiracy may as well be shown by circumstances from which the jury may infer it, as by express acts or facts; and further true that it is rarely shown by direct and positive testimony; but to establish a criminal conspiracy there must be shown by facts or circumstances a joint assent of the minds of the accused to commit the criminal act charged. Such evidence is wholly wanting here, hence the giving of instruction No. 2 was error. It is, however, insisted for the Commonwealth that appellant could not have been prejudiced by this instruction, as it only applied to the crime of murder, whereas he was found guilty of voluntary manslaughter, to which it had no reference. While this is true, the instruction was calculated to magnify the prosecution in the minds of the jury, and though the existence of a conspiracy was not an element essential to the showing of his guilt of manslaughter, we cannot speculate as to whether the jury were or were not influenced by it in finding him a participant in the homicide. The other instructions given in the case fully pre-

sented all the law applicable to the facts necessary for the guidance of the jury in arriving at a verdict.

Appellee's complaint of error in the admission by the trial court of the testimony of the boy, Tobe Archer, as to the statement of Mary Chism that "Milt (Mansfield) says if Thurman come to arrest him, God damn him, he was going to kill him," must also be sustained. It appears from the testimony of Archer that this statement was made by Mary Chism before Mansfield left the Chism residence and also before the arrival there of Thurman. It does not, however, appear from his testimony whether the statement in question was made before or after Thurman had been telephoned for by Alex. Abston, at the direction of Richard Chism. According to Archer's further testimony, when Mary Chism repeated the alleged threat made by Mansfield, he (Archer) was standing near and in front of the porch of the Chism house, Mary about the middle of the porch, in front of the door leading into the house and that the door was then open and appellant and Mansfield were standing together about the middle of the room, in the rear of Mary Chism. After repeating the statement made by Mary Chism, the witness was asked as follows:

"Q. Was that in their presence and hearing? A. I suppose they could hear. Q. You mean she came out on the porch and they were standing in the middle of the room when Mary made this statement? A. Yes, sir. Q. Do you know whether they were close enough to hear? A. Well, if they had been listening they were close enough to hear, yes, sir."

The most that can be said of the foregoing testimony of Archer is that appellant and Mansfield were standing where they might or could have heard the statement of Mary Chism if they had been listening, but it stops short of showing that they were listening to what Mary said or that they, in fact, heard her statement. Whether appellant and Mansfield were then talking to each other or to Richard Chism, who was also in the room, cannot be told from Archer's testimony. If any presumption is to be indulged from the facts related by the witness, it would reasonably be expected that if appellant or Mansfield heard the statement made by Mary Chism it would have induced some response or comment from one or both of them; but Archer admits that no response was made, nor does he testify as to anything subsequently

said or done on the part of either of them indicating that they had heard the girl's statement. Two things must concur to make such testimony competent as evidence. It must have been made in appellant's presence and hearing and at a time and under such circumstances as would naturally call for a response from him. Manifestly, these essential elements are both wanting in this case. In Newman v. Commonwealth, 28 R. 81, it was held, in a prosecution for murder, that a statement made by a witness to the defendant to which the latter made no answer, was not admissible. In Eaton v. Commonwealth, 122 Ky. 7, it was held that admissions by acquiescence to what some one said in the presence of the defendant under trial for a crime, are not admissible, unless it plainly appears that the remark was fully understood by the defendant and was uttered under such circumstances as would afford him an opportunity to speak and naturally call for some reply from a person similarly situated. In Hayden v. Commonwealth, 140 Ky. 634, it was held that on a separate trial of one of several persons charged with crime, evidence of statements by the others, while in custody and in the presence of accused, to which he made no response, was inadmissible to show his guilt of the crime. The following additional authorities fully adhere to the rule announced in the cases, supra: Lyon v. Commonwealth, 29 R. 1020; Sprouse v. Commonwealth, 132 Ky. 269; Hall v. Commonwealth, 29 R. 485; Wilson v. Commonwealth, 121 S. W. 430.

The prejudicial effect that must have resulted to appellant from the admission of the statement of Mary Chism as related by Archer cannot be doubted, as it was the only evidence furnished to support the theory of the prosecution that appellant was apprised in advance of the killing of Thurman of the intention of Mansfield to kill him; and also conduced to prove that whatever participation he had in the killing of Thurman by Mansfield was in aid of the previously expressed intention of the latter to take his life. Consequently, the admission of this incompetent evidence, if there were no other error appearing in the record, is, of itself, sufficient to compel the reversal of the judgment of conviction.

It will be unnecessary to discuss other errors assigned by appellant, as they are not, in our opinion, sufficient to require a reversal and are not likely to be again committed by the court on another trial. On ac-

count of the error of the court in admitting the testimony of Archer as to the statements of Mary Chism, and in giving the instruction as to conspiracy, the judgment is reversed and the cause remanded to the circuit court for a new trial in conformity to the opinion.