## Burden v. Commonwealth.

(Decided November 30, 1926.)

### Appeal from Muhlenberg Circuit Court.

1. Homicide—Evidence Held to Sustain Conviction for Murder.— Verdict of guilty in prosecution for murder held sustained by evidence.
2. Criminal Law—Conviction Cannot be Set Aside Unless Result of Passion or Prejudice or Not Founded on Convincing Evidence. —Conviction in criminal prosecution cannot be said to be so flagrantly against evidence as to authorize setting aside, unless at first blush it should appear to be result of passion or prejudice of jury or to be founded upon no evidence of convincing or convicting force.
3. Homicide—Instruction as to Self-Defense, Leaving Out of Consideration Opportunity to Escape, Held Not Erroneous.—Instruction as to self-defense in murder prosecution, though it leaves out of consideration opportunity for or means of escape, held not erroneous.

C. A. DENNY for appellant.

FRANK E. DAUGHERTY, Attorney General, and G. D. LITSEY, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE THOMAS— Affirming.

On May 16, 1925, at about the hour of 11:30 a. m., in the mining town of Powderly, Muhlenberg county, Ken-

tucky, the appellant, Nellie May Burden, shot and killed Clarrissa Edwards. She was indicted by the grand jury of that county charged with murder and upon her trial was convicted and sentenced to confinement in the penitentiary for life, and on this appeal from the judgment pronounced on that verdict after her motion for a new trial was overruled, her counsel insists (1), that the verdict is not sustained by the evidence and is flagrantly against it, and (2), that the self-defense instruction was so drafted as to be prejudicial to appellant's substantial rights; and to those two contentions we will proceed to address ourselves.

1. Appellant, to whom we shall hereafter refer as defendant, and the deceased resided in adjoining small mining houses in the mining town of Powderly, and they were each facing the public road running between Greenville and Central City and were what are termed in this record as "gun barrel" houses. Defendant claims to have had a garden at the rear of her house and each of them had doors facing the other one close to their rear. According to defendant's testimony deceased on the afternoon preceding the killing came over to defendant's house and gave her a severe cursing and abusing for some alleged slanderous report that defendant had circulated against deceased. Defendant denied the accusation, but admits that she gave deceased the same character of tongue lashing. Nothing more seems to have come of that episode, but later in the day two witnesses for defendant testified that while she was at the croquet ground some distance from her house deceased was met by the witnesses and she was carrying a large stick and made inquiry as to the whereabouts of defendant, to whom she threatened to do violence with the stick on account of the same actual or imaginary slanderous report. The witnesses saw defendant and told her of such threats, but she did not leave the croquet grounds until late in the afternoon, although deceased, some time before that, appeared at the same place but without attempting to execute the alleged threats. Defendant said that in the earlier part of the morning of the day of the killing deceased made a similar assault upon her as she did the day before, accompanied with like abusive language, but no physical conflict occurred at that time. Somewhere about 11 o'clock on the same day deceased, while standing in her back door, again accosted defendant with a

severe word assault and while the latter was in her residence either in or near her back door, but no collision of any kind then happened. Defendant testified that immediately thereafter she armed herself and went into her garden to gather some vegetables for dinner and after obtaining them she was going along the opposite side of her house to its front when deceased came around the front with a large piece of iron in her hand and with it raised threatened to strike her, whereupon she drew her pistol, which was in her dress pocket under her apron, and shot deceased some three or four times, from the effects of which she died. The body of deceased was found with her feet in the public road and her head lying on the bank of the road immediately or about in front of defendant's house.

The Commonwealth introduced two witnesses who claimed to have seen the essential parts of the difficulty, and they were James Dukes and Brank Dukes, his son, the latter of whom was about 25 years of age. Those witnesses were miners and were in an automobile and had started to Greenville. According to their testimony about the time they passed defendant's house, which was only 9½ feet from the road, they passed deceased leading a small child with no weapon or other thing in her hands. A comparatively short distance they met defendant in the road traveling towards and meeting the deceased and immediately upon passing her they heard the first shot and looked back and saw two or three other shots fired, with deceased backing and making no demonstrations to injure or harm defendant, and that the latter, as soon as she ceased shooting, picked up a piece of iron that appeared to be a part of an automobile spring and which was some seven, eight or ten feet from where she ceased shooting, and she then went and sat upon her front porch, carrying with her the piece of iron and her pistol. Both of those witnesses stated that defendant had no basket in which she testified she was carrying her vegetables at the time of the shooting. Some testimony introduced by defendant contradicted the prosecuting witnesses on some of the points to which they testified, especially that of distances; and James Dukes was impeached for truth and veracity. But there was no such testimony as to his son. There was also testimony contradicting defendant in some of the minor details she related.

If the testimony of the two alleged eye-witnesses introduced by the Commonwealth, one of whom is entirely unimpeached, is to be believed there would appear to be no legal excuse for the homicide, and their testimony is sought to be impeached by only that of defendant as to what occurred and as to the relative situation of the parties immediately at the time of shooting. Her testimony as to difficulties with deceased is unsupported by any witness except as to the threats made by the deceased at the time the two witnesses for defendant saw her with the stick and threatening defendant on the afternoon prior to the killing. However, all of that testimony, if it was undisputably true, created only a circumstance in corroboration of defendant's story as to how the killing occurred. Even then the jury may have concluded, and which they were authorized to do from the circumstances, that defendant was smarting under the false accusations preferred against her by deceased and because of the threats of the latter and for that reason she concluded to and did commit the homicide. They may have disbelieved such assaults and threats altogether but did believe the testimony of the two prosecuting witnesses, notwithstanding one of them was impeached, and if so, we repeat, the offense would appear to be premeditated.

We have constantly and repeatedly announced the rule to be that a judgment of conviction in a criminal prosecution could not be said to be so flagrantly against the evidence as to authorize the court to set it aside for that reason, unless at first blush it appeared to be the result of passion or prejudice on the part of the jury, or to have been founded upon no evidence of convincing or convicting force. Our opinions are without dissent on that proposition, two of the latest of which are Winchester v. Commonwealth, 210 Ky. 685, and Deaton v. Commonwealth, 211 Ky. 651. Following that rule it clearly appears that we are without authority to reverse the judgment upon that ground, although we might be of the opinion that had we been on the jury we would not have returned so severe a verdict. The contention, therefore, must fail.

2. Under this contention it is insisted that instruction No. 3, embodying defendant's right of self-defense, was erroneous in the particular hereinafter pointed out and discussed. That instruction says: ''If you shall believe from the evidence that at the time the defendant shot and wounded the said Clarrissa Edwards, she be-

lieved and had reasonable grounds to believe that she was then and there in danger of death or the infliction of some great bodily harm at the hands of said Clarrissa Edwards, and that it was necessary, or believed by the defendant in the exercise of a reasonable judgment to be necessary, to shoot the deceased, in order to avert that danger, real or to the defendant apparent, then you will acquit the defendant upon the grounds of self-defense or apparent necessity.'' It is argued with much seriousness and earnestness that since defendant testified that the killing occurred on her premises in her front yard where she was assaulted by deceased, the self-defense instruction should have said to the jury, in substance, that if it believed from the evidence those facts, then she had the right to stand her ground although she may have had reasonable means of escape, and to shoot and kill deceased in defense of herself on her own premises, and the cases of Estep v. Commonwealth, 86 Ky. 39; Baker v. Commonwealth, 93 Ky. 302, and others closely following them in point of time, are relied on in support of that contention. But the trouble with it is that the complained of instruction in this case did not require defendant to avail herself of any means of escape, reasonable or otherwise, and the jury was authorized therein to acquit her if it believed that at the time of the shooting she believed and had reasonable grounds to believe that she was then and there in danger of death or great bodily harm at the hands of deceased, whether such danger was real or to the defendant apparent, and there was no requirement therein whatever that she should avail herself of any sort of means of escape, which requirement was formerly incorporated in the self-defense instruction, but latterly has been generally omitted therefrom. See the case of Greer v. Commonwealth, 164 Ky. 396.

In discussing the former ''means of escape'' feature of self-defense instructions the opinion in the latter case said: ''The former rule was that the person assailed, in order that the killing of his assailant might be excusable, must have availed himself of the opportunity to escape if such there was, and have slain his assailant only as a last resort; but the modern rule in Kentucky is that whether he should stand his ground or give back is a question for the jury to determine under an instruction declaring apparent necessity a legal excuse for the homicide and the measure and only test of his right to slay his assailant. Nor do we find any good reason why any dis-

tinction should be made between homicides occurring on the premises of the slayer under 'the circumstances here shown, and those occurring elsewhere, especially where the assailant commits no trespass in going or remaining thereon." For a discussion of the contention now made see case of Staples v. Commonwealth, 178 Ky. 429, in which the excerpt from the Greer opinion is inserted with approval. .

We do not mean to be understood as holding in this opinion that it would be reversible error to follow our former opinions by inserting in the self-defense instruction the "means of escape" clause if properly worded, but we do mean to be understood that it is not error to omit it entirely, which was done in this case and which left the jury to acquit defendant if the crime was committed in defending herself from apparent or to the defendant reasonably apparent threatened danger at the hands of the deceased, without requiring her to avail herself of any character of means of escape, although the offense was committed in defendant's dwelling or surrounding premises. In other words, we hold that when the self-defense instruction leaves entirely out of consideration by the jury the opportunity for or means of escape element, then there is no room or place in the record for the criticism relied on by counsel for defendant in his second contention for reversal.

Finding no error prejudicial to defendant's substantial rights, the judgment is affirmed.