# Slone v. Commonwealth.

(Decided December 2, 1930.)

H. H. SMITH for appellant.

J. W. CAMMACK, Attorney General, and HOWARD SMITH GENTRY for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE THOMAS— Reversing.

The appellant, William J. Slone, and his son, Tony Slone, were jointly indicted by the grand jury of Knott county in which they were accused of murdering Talt Jacobs. At his separate trial appellant was convicted of voluntary manslaughter and punished by confinement in the penitentiary for two years. From the verdict and judgment pronounced thereon he prosecutes this appeal, urging by his counsel two major and material errors authorizing a reversal of the judgment, and which are: (1) That the evidence did not guiltily connect appellant with the homicide, and for which reason his motion for a peremptory instruction for acquittal should have been given, but, if mistaken in that, then the verdict is flagrantly against the evidence, and (2) error in the self-defense instruction.

The disposition of error (1) calls for a brief summary of the testimony. The killing occurred on June 15, 1927, in the barn lot of Lige Owens, situated up a branch which was a tributary of Cane creek in Knott county, between 10:00 and 11:00 a. m. Appellant resided on the creek not far from the point where the branch ran into it, and conducted a retail store in connection with

which was a gristmill operated by him and with which he ground meal for his neighboring customers. Talt Jacobs was a son-in-law of Isom Slone, a relative of appellant, and who resided in the neighborhood near to the residence of Lige Owens, but farther up the branch. On the same morning, but before the killing, a third Mr. Slone brought some corn to appellant's store to be ground into meal, but it was put into the storehouse and not ground because appellant did not then have sufficient gas to run his mill. The customer, Slone, testified as a witness for the commonwealth, and said that while he was at the store of appellant he observed some hogs in a pen nearby, when he remarked that on his way to the store he saw some dead hogs just above Elijah Owens' residence, and on the branch, and that appellant remarked: "I bet they are mine" and said "By God, the d—— s—— of a b—— is going to pay me for my hogs. They have a fashion of dogging hogs and killing them down there;" that he later got a Winchester shotgun and crossed the creek and started in the direction of the branch, but witness did not state that appellant made any threats of personal harm against the deceased or any one else, and the remarks so attributed to him by the witness were denied by appellant, he stating that he had already procured his shotgun when the witness arrived at his store with the sack of corn with the intention of going up the creek to some mulberry trees for the purpose of killing squirrels. He, furthermore, stated that the only reference to hogs on the occasion testified to by the witness was made after the sack of corn had been deposited in the store and the two had gone out of it, when the customer, Slone, stated that at about dark on the evening before he saw a hog by the side of the road bleeding and it looked like it was dead, and that when he passed it this morning it was dead; whereupon appellant said that it was not his hog "Because when I fed my hogs this morning they were all there," and which he said was the entire conversation about hogs.

When appellant reached the branch and had started up it he saw Isom Slone, the father-in-law of the deceased, the latter, and appellant's son, Tony Slone, standing by the side of a wagon which they were using in removing debris and scattered rails that a recent flood had produced in the branch and in which panels of a washed away rail fence were deposited. The work was being performed by Tony and the deceased under an

employment by Owens. Before he reached them Tony and deceased started with the wagon toward the barn lot with the father-in-law walking. The wagon was stopped near the barn and the three went into one of its stalls where there was a remnant of a keg of whisky, and they proceeded to consume a portion of it, but, according to appellant, Isom Slone, the father-in-law, was already considerably intoxicated and the other two were at least partially so. Appellant also testified that when he appeared near the wagon the father-in-law, Isom Slone, called him a s—— of a b—— and asked him, where he was going, and started towards him, when he took his shotgun off his shoulder and sat the breech end on the ground and stated that he had started up the branch when the deceased said: "You haven't got no business up the branch and you are not going," when appellant said: "I have nothing against you fellows and I am going," which was followed by a statement of deceased that "He would kill me as soon as he could get his gun;" that deceased then started to the place in the branch from whence they had driven the wagon where his coat in which he had his pistol was hung on a sapling or put upon a stump, and while he was gone Isom Slone began to threaten and abuse appellant, who then concluded to return home and started in that direction, followed by Isom Slone and his son, Tony. They had gotten but a short distance when the deceased returned with his pistol and, according to the testimony of both appellant and his son Tony, he attempted to shoot appellant, snapping his pistol two or three times in the attempt, but it did not fire. After such unsuccessful attempts, and while deceased was continuing to snap his pistol, Tony came from behind appellant where he was walking with Isom Slone, the father-in-law of deceased, and shot the latter from the effects of which he died. The above account as to what happened at the immediate time and place of the killing is told in a straightforward manner, and without impairment by cross-examination, by both appellant and his son, Tony.

The commonwealth's witness, Isom Slone, in rendering his account of what occurred at the same time and place, said that on the fatal morning he had gone to Slone's branch to examine some chair timber, and that he was returning from that place about 10 o'clock when he discovered his son-in-law and Tony Slone working at the wagon and they asked him to go to the barn where

they had some liquor, to which he at first objected, but was finally persuaded to do so. When they got there they went into the stall of the barn and sat upon some sacks and drank some of the whisky taken from a partially emptied keg or barrel, and while they were sitting there the appellant came up and inquired for Lige Owens, and said some God d—— s—— of a b—— had killed his hogs and no man could kill his hogs and live, that the deceased then stated that he had not killed any of appellant's hogs, when appellant again said that some s—— of a b—— had done so, and at the same time changed the position of his shotgun but did not point it at any one or threaten to shoot. Some few words passed of an unimportant nature, when the deceased left the stall and appellant "started down the road and I started with him and we got down there about half way between the barn and crib and he (appellant) stopped and said 'right here is where Elijah buried some hogs. He has got a habit of killing people's hogs and burying them,' " and at the same time he "was swinging his gun around."

Witness then said to him, "Bill, I am a friend to you, don't be so mad," when he answered "I don't want no trouble, I haven't got anything against you," and witness continued: "I was standing there holding the gun and Talt and Tony right beside him and Talt passed Bill a few steps, and just as Talt got against him the pistol fired." Witness was later asked if anything was said there by any one just before or at the time the shots were fired, and he answered: "Nothing, only he (appellant) was cursing Elijah, told me he had nothing against me and then the pistol fired." He was also asked: "Where was Tony at the time he fired these shots as to Jacobs with reference to you and Bill?" A. "He was right in front." The last three witnesses referred to, one of whom (Isom Slone) testified for the commonwealth, and the other two for appellant, were the only ones who were present at the time of the shooting. Their testimony contains all of the material and substantial proof in the case of a guilty nature, save and except the denied statements as to what occurred at appellant's store made by the customer, Slone. There are some circumstances appearing in the record tending to corroborate the testimony of appellant and his son, Tony, which it is not thought necessary to refer to.

From the testimony as so outlined it uncontradictedly appears that Tony Slone was the sole slayer of the

deceased, and that, according to his testimony, borne out by that of his father and not seriously controverted by Isom Slone, the father-in-law of deceased, the shooting by Tony was in defense of his father, the appellant. But, if it should be concluded that Tony did not shoot in the defense of his father, or that the immediate facts were insufficient to create as to him the right of self-defense or defense of another, then it is difficult for us to discover any fact in the record connecting appellant with the killing as an aider and abettor of his son, who actually did the killing, there being no evidence of any concerted action between them, or any effort on the part of appellant to do the deceased harm. On the contrary, all of the testimony points most unerringly to the fact that Tony did the killing on his own accord, whether he was or not justified in doing so in defense of his father.

The recent case of Watkins v. Commonwealth, 227 Ky. 100, 12 S. W. (2d) 329, involved the question now under consideration, i. e., the sufficiency of the evidence against an alleged aider and abetter in the commission of the crime to authorize the submission of the case to the jury as to him. The testimony pointing to defendant's guilt in that case, as will appear from a reading of the opinion, was, perhaps, stronger against the accused aider and abetter therein than it is against appellant in this record; but, following a long line of cases from this court adopting the settled rule of criminal practice that mere suspicions and surmises are not sufficient to sustain a conviction, we held in that case that a peremptory instruction of acquittal should have been given. Many prior cases from this court, in which the same question was before us and similarly disposed of, are cited and commented on in that opinion, for which reason we will not reinsert them herein, nor will we elaborate upon the rule, but content ourselves with a reference to the opinion for that information.

In this case no one testified that appellant was intoxicated, nor did he (according to the evidence) take a drink at the barn or at any time after he got with his son Tony, the deceased, and the latter's father-in-law, or before then on that day. In other words, he was sober as he so testified, and, at most, if we should accept the testimony of the father-in-law, appellant was angry only at Owens, or whoever had killed or injured his hogs, but he breathed no homicidal threats against any one, unless against Owens, if indeed he did that much. It is per-

fectly apparent that the deceased, Tony, and Isom Slone were considerably intoxicated, the latter being more so than the other two. Deceased left the crowd and went away, returning with a pistol. If appellant intended to do him harm it was within his power to use his shotgun, but instead he did not even attempt to do so, and, according to the testimony, his son came from his rear and shot the deceased as he was approaching toward appellant (and trying to shoot him according to the testimony of father and son) without any evidence to show that the latter was at fault or instigated or in any wise encouraged his son in doing the shooting. One cannot be punished for the crime of another, unless he in some way invited or encouraged the other to commit it, and it is as essential to the conviction of an alleged aider and abetter that his aiding and abetting acts and conduct be proved as it is to prove the commission of the crime by the principal. We are quite convinced that under the rules governing the administration of the criminal law, as outlined in the cases supra, the testimony in this case was insufficient to sustain the conviction of appellant as an aider and abetter of his son in the killing of the deceased, and, if upon another trial it should be substantially the same as on this one, the offered peremptory instruction should be given.

The given instruction on self-defense contained this language: "And that the only safe means of escaping or warding off such danger or the only safe means apparent to said Bill Slone or Tony Slone of escaping or warding off such danger was to so shoot, wound and kill said Jacobs, you will acquit the defendant on the ground of self-defense, defense of another or apparent necessity." Whatever may have been the ancient or immediately succeeding practice with reference to the phraseology in the instruction submitting the right of self-defense in criminal prosecutions, this court for a considerable time past has continuously held that such language in the self-defense instruction was erroneous, in that it conveyed the idea that an accused could not defend himself or another, if he, or the other, could escape the threatened danger by flight, when the law did not demand any such action as a condition precedent to the right of self-defense or defense of another.

In the discussion by which such conclusion was reached, it was pointed out in our opinions that there is a substantial difference between the sense conveyed

to the jury in the use of the word "escape" and the words "avoid," or "warding off," the last two not embodying the idea of flight that is necessarily conveyed by the use of the former. So that, if in this case the words "avoiding," or "warding off," or "averting" had been employed in the instruction instead of the word "escaping," it would not have rendered the instruction fatal, or even erroneous (Greer case, post), because it then would have conveyed only the idea that the slayer could not rely on the right to defend himself, or another, so long as in the exercise of a reasonable discretion he could have avoided it short of actually fleeing or running away, which, if attempted, might endanger him more than if he had stood his ground. Some of the cases holding that the above-inserted language from the self-defense instruction in this case was erroneous are: Arnold v. Commonwealth, 55 S. W. 894, 898, 21 Ky. Law Rep. 1566; Howard v. Commonwealth, 67 S. W. 1003, 1004, 24 Ky. Law Rep. 91; Buckles v. Commonwealth, 113 Ky. 795, 68 S. W. 1084, 1085, 24 Ky. Law Rep. 571; Greer v. Commonwealth, 164 Ky. 396, 175 S. W. 665; Caudill v. Commonwealth, 234 Ky. 142, 27 S. W. (2d) 705, and a number of others cited in those opinions. Compare, also, Burden v. Commonwealth, 216 Ky. 787, 288 S. W. 742; Slone v. Commonwealth, 230 Ky. 199, 18 S. W. (2d) 1005; and Gill v. Commonwealth, 235 Ky. 351, 31 S. W. (2d) 608.

In the Arnold case in disposing of the question now under consideration the opinion said: "The word 'escape' is not proper under any circumstances, and it is particularly improper and misleading when used in reference to a person accused of homicide, and who is assaulted in his own yard, and near to his own dwelling-house." In the Howard case the opinion on the same subject said: "The latter part of this instruction (the self-defense one) was erroneous in the use of the word 'escape,' which seems to imply that defendant must seek safety in flight, or other means than by defending himself from the impending danger. See Cockrill v. Commonwealth, 95 Ky. 26, 23 S. W. 659 (15 Ky. Law Rep. 328); Eversole v. Commonwealth, 95 Ky. 627, 26 S. W. 816 (16 Ky. Law Rep. 143), and Arnold v. Commonwealth (Ky.) 55 S. W. 894 (21 Ky. Law Rep. 1566)." The opinions in other cases are equally emphatic in their criticism of the use of the word "escape" in the self-defense instruction, and from which it results that

the court erred in employing it in the manner that was done in the self-defense instruction in this case.

For the reasons indicated the judgment is reversed, with directions to grant the new trial and for proceedings consistent with this opinion.