## Short v. Commonwealth.

(Decided Dec. 15, 1933.)

820

MURRAY L. BROWN for appellant.

BAILEY P. WOOTTON, Attorney General, and DAVID C. WALLS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Reversing.

Bill Short, Ed Benge, and Shafter Benge, were indicted by the grand jury of the Clay circuit court, charged with the crime of burning a barn, the property of J. C. Foutz. On a separate trial Short was convicted and his punishment fixed at confinement in the State Penitentiary for a period of five years. He is here insisting that the court admitted incompetent evidence and erred in refusing to give to the jury an instruction directing his acquittal.

Considering the last question first, to dispose of it properly requires a review of the evidence. It is substantially as follows: J. C. Foutz was the owner of a barn at Stoney Point, Clay county. It was surrounded by woods on three sides. It was discovered on fire in the evening before dark on the 27th day of April, 1932. Some time before its destruction—the exact date is not shown by the evidence—he was the owner of a tenant house, which was destroyed by fire. A day or two before Foutz's barn was burned, a barn in the vicinity of it, the property of P. N. House, was also destroyed by fire. The summer before Foutz's barn was burned, a sheep belonging to him had its "brains shot out." The barn of Foutz was located about one-half mile from House's, which was destroyed by fire. Ed Benge, a codefendant, is a brother-in-law of J. C. Foutz and the father of Shafter Benge. Their home was a short distance from Bill Short's and also from Foutz's barn. Walter Powell lived within 200 or 300 yards of Foutz's barn. A lane leading by Powell's home ran by Foutz's barn.

Ed Benge owned a small mule which Short was in the habit of borrowing for the purpose of riding and work. J. C. Foutz's residence was within about a

quarter of a mile of the barn. He was at home on the evening it was discovered on fire. He was unwell at the time and for this reason he did not go to the barn when he observed it was burning. His grown son, who had returned to the community a short while before the barn was burned, in passing by it, about 5:30 o'clock p. m., saw it was burning on one side, near the ground. Without stopping he went about three-quarters of a mile to the home of Luther and Bert Martin, Little and Bill Hughes, and got them and John Noe and wife and returned to the barn. He conceived the idea of obtaining bloodhounds to use to discover who had set the barn on fire, and with this intention to protect the ground around and in the barn, from intrusion, he forbade any one to approach, or enter, it. During the morning of the day Foutz's barn was burned, Bill Short went to the home of Ed Benge and borrowed his little mule to ride to Ed Rader's store. He obtained the mule and went to Rader's store, where he claims he met "some old friends." He took a few drinks with them. They ate their dinner, then wanted more liquor, and to secure it, they "made a jackpot," and sent Short to Laurel county after it. He left Rader's store about 1:30 o'clock, and on the way, before he reached the home of Walter Powell, he came up with Shafter Benge. They went together on the little mule to the home of Walter Powell, where Shafter Benge remained, and Short, riding the mule, went through a lane that passed by Powell's home, on by Foutz's barn, to Laurel county, where he obtained the liquor. On his return, he stopped at Palmer's about 4 o'clock and tried to borrow $2. Failing to obtain the loan, he returned between 4 and 5 o'clock to the home of Powell, where he found Shafter Benge, Walter Powell and family. Before Short and Benge reached the home of Walter Powell, when Short was on his way after the liquor, Powell saw him and Shafter Benge about 3 o'clock, riding the mule coming through the lane toward his home where Shafter Benge remained until Short's return. After Short's return to Powell's home, some time between 4 and 5 o'clock, Powell discovered the fire at the barn of Foutz. From the time Short returned to his home "it was about half hour or longer" until Powell learned that Foutz's barn was burning. From the time Shafter Benge arrived with Short, until Short's return to Powell's home with the liquor, Shafter Benge remained in

the presence of Powell and his family. At the time Powell informed Short and Shafter Benge of the fact that Foutz's barn was burning, they were eating supper. Powell left and went to the barn and returned. After Short and Benge finished eating (both of them at the time pretty well filled up with liquor), they went out and got on the little mule and rode it through the lane, up near the barn. In a short period of time, one or both of them led the mule away some distance, hitched it, and returned to the barn. Martin, Hughes, Foutz, and others were present at the barn. The fact that Sam Foutz desired no one to approach near or enter the barn until bloodhounds could be obtained was made known to Short and Shafter Benge. Short suggested to the crowd that the fire could be put out, if they had something with which to knock off the boxing that was on fire. He was informed "they did not want it out." He announced that he could put it out if he had an axe or a hammer, but nothing was done towards putting it out or impeding its progress. During that day, the previous day and night, it had been raining, and the ground was wet and muddy, and, of course, the material in the walls of the barn was wet, hence it burned slowly. It was finally consumed about 9 o'clock that night. Short and Benge were perceptibly drunk. Short engaged in some singing, and entered the barn. Shafter Benge, during the time he was present, was on different sides of the barn. After remaining until the barn was about consumed, Short and Benge walked to where the little mule was hitched, unhitched it, both of them got on it, and rode away, going to the home of Bill Short. Hounds were obtained, whether they were bloodhounds, fox or beagle hounds, or a mixed breed, the evidence does not disclose; but on the morning following the burning of the barn, they were conducted to the tracks of Short and Benge leading to where the little mule had been hitched, which, of course, the hounds followed, and because Short and Benge from that point had ridden the mule, the parties who engaged in using the bloodhounds took up the tracks of the little mule and followed them to the home of Short, thence to the home of Ed Benge to where Shafter Benge had ridden it from the home of Short. Much ado is made of the presence of the men's and mule's tracks in the lane passing the barn and at the point where the mule was hitched, and of the fact that they were followed

from that point via Short's home to Ed Benge's. A large number of witnesses were introduced by the commonwealth to show the presence of the men's tracks, and those of the mule, the conduct of the hounds, and the persons engaged in following the tracks of the men and the mule. It was not shown, or attempted to be shown, that any ill feelings had ever existed between Foutz, the owner of the barn, or his family, and Ed Benge, Shafter Benge, Bill Short, and family. Also many witnesses were introduced by the commonwealth to show the relations of Short and the Benges, their visiting and re-visiting each other at their homes, and the use by Short of the little mule on different occasions.

As evidencing a motive on the part of the three defendants to burn the barn of Foutz, Foutz and his son testified about a conversation between J. C. Foutz and Short on the morning before the burning of the barn, while near the home of both Short and Foutz, to the effect that J. C. Foutz and Short discussed Short's renting of Foutz's barn in which to house a crop of tobacco, he contemplated growing that year. The language, as used by the parties, as disclosed by the testimony of Foutz and his son, fails to indicate any unpleasant or unkind feelings between Short and J. C. Foutz at that time. Short was insisting that Foutz had already agreed to rent him the barn, and Foutz stated that he had not agreed to rent it. And as a part of this conversation, J. C. Foutz and Sam Foutz testified that Short claimed he had rented the barn and that J. C. Foutz had gone back on him; then "he reached up and set his hat on his head and started his mule and says that Chuck will be back on the hill and you will see more fire than you have ever seen there before." As further evidence of motive, J. C. Foutz narrates a conversation of him and Short, concerning a trade of a hog, when Short stated Foutz was asking too much for the hog and said to Foutz:

"A man that would ask such an exorbitant price for hogs as you did, if I was on the jury I would either hang him or I would hang the jury or send him to the penitentiary."

Supplementing the evidence tending to show a motive, the commonwealth was permitted to show that a tenant house of Foutz had been burned and that a sheep belonging to him had been shot, also the barn of House

had been burned; but it failed to offer any evidence showing Short was either directly or indirectly connected with either occurrence, or that the tenant house was set on fire, or the sheep was intentionally killed, or that House's barn was accidentally or intentionally set on fire. Such testimony was permitted to go to the jury over the objections of Short, with the court's admonition to the jury "that the jury might consider it [the evidence as to these other burnings and the killing of the sheep] as bearing on the question as whether or not J. C. Foutz's barn was purposely burned or whether it was purely an accident. It cannot be competent for other purposes and you cannot consider it as affecting the defendant on this particular charge in any way at all." As an additional scrap of evidence tending to show a motive on the part of Short, the commonwealth proved by Gilbert Mills that Short said "that Chuck Walton sent word that he was coming in here and that he was going to burn the oldest ones first." Chuck seems to be the father-in-law of Short, an individual residing in Laurel county. And that Short also said to this witness: "Do you know that I would like to see everything that dam son of a bitch has go up in ashes, it would be better for these poor devils out in here." Sallie Boggs testified that she was at Rader's store one day and she heard some men remark to Bill Short "to stay longer, or don't be in a hurry it was raining," and Bill said "I have got to go I have got some more barns to burn tonight." She testified this occurred after the burning of Foutz's barn.

Our resume of the evidence fairly states it as accurately as it is shown by the record, except in rebuttal the commonwealth introduced several witnesses attacking the moral character of Short; some of them testified that when drunk he was dangerous, and others that his moral character was bad. The commonwealth introduced Walter Powell, whose testimony is not impeached or questioned, and it completely exonerates Shafter Benge and Ed Benge as well as Short. There is no fact or circumstance showing that the Foutz barn was intentionally set on fire or that either the Benges or Short had any connection direct or indirect with setting it on fire. It is superfluous to say that the evidence concerning the killing of Foutz's sheep, the burning of his tenant house, and the burning of P. N.

House's barn was incompetent and had no place in the case. Instead of admonishing the jury relative thereto, the court should have excluded it as a whole and admonished the jury to disregard it. J. C. Foutz, on cross-examination, admitted that Short's remark about the hog trade was jocular and was so understood by him. The remark of Short concerning "Chuck" is in no sense a threat and not susceptible of the interpretation of showing a motive to commit the crime of barn burning. Much evidence was introduced by the commonwealth showing the relations and the associations of Short and Benges, which were natural and reasonable, according to their habits and mode of life, and are not susceptible of the construction as constituting evidence of a conspiracy to commit crime. Pharris v. Commonwealth, 198 Ky. 51, 248 S. W. 230; Howard v. Commonwealth, 220 Ky. 585, 295 S. W. 888; Pace v. Commonwealth, 170 Ky. 560, 186 S. W. 142; Lockard v. Commonwealth, 193 Ky. 619, 237 S. W. 26; Anderson v. Commonwealth, 196 Ky. 30, 244 S. W. 315. It is not doubtful that a conspiracy may be shown by circumstances, from which the jury may infer its existence, and when the circumstances lead to that inference, it is for the jury to determine whether it did or did not exist; but a conspiracy cannot be established by suspicion, nor by evidence showing relations and associations between the parties, which are natural and reasonable, according to their habits and mode of life. Such relations and associations do not constitute evidence of conspiracy. Whether conspiracy is charged or not, guilt cannot be established by mere suspicion or surmise. York v. Commonwealth, 235 Ky. 751, 32 S. W. (2d) 331. Suspicion and surmise are insufficient to sustain a conviction. Slone v. Commonwealth, 236 Ky. 299, 33 S. W. (2d) 8. Even if the statements of Short be admitted as having been made by him and that they show motive to burn Foutz's barn, mere motive alone is not sufficient to warrant a conviction. Means v. Commonwealth, 238 Ky. 366, 38 S. W. (2d) 193. The evidence is insufficient to authorize or sustain the conviction of Short. Without proof that Foutz's barn was intentionally set on fire and that Short committed or participated in the commission of the act, it was neither in law nor in fact committed by him. Notwithstanding the evidence of motive and of his bad reputation for

morals, he has not been proven guilty of the crime charged and should not be punished. It is axiomatic that to sustain a criminal charge, the evidence must show the crime was committed and it was committed by the accused. Hendrickson v. Commonwealth, 235 Ky. 462, 31 S. W. (2d) 712. It was brought out in the evidence that Short had served a term in the penitentiary. He should not be convicted on general principles, without some sort of evidence showing that a crime had been committed and that he had committed it or had conspired with another to commit it or was an accessory to its commission. Tarkaney v. Commonwealth, 240 Ky. 790, 43 S. W. (2d) 34. The conviction of Short rests entirely on suspicion, surmise, and supposition. The fact Foutz's barn was destroyed by fire and Short rode the little mule in passing by it, before or near the time of the fire, is utterly insufficient to create a well-founded suspicion of his guilt. This is substantially the effect of the competent evidence against him. Tracking of the bloodhounds and the following of the mule tracks, where it was known Short and Shafter Benge had traveled and the way the mule had also traveled, is not in any sense incriminating evidence.

The judgment is reversed, with directions to award Short a new trial and for proceedings consistent with this opinion.