## Lockard v. Commonwealth.

## Morgan v. Commonwealth.

(Decided February 3, 1922.)

## Appeals from Whitley Circuit Court.

1. Criminal Law—Conspiracy—Circumstantial Evidence.—A conspiracy may be proven by circumstantial evidence, since in many cases it is extremely difficult to obtain direct evidence establishing it; but where the only evidence or circumstance to establish it was that the alleged conspirators were together for several hours before the commission of the alleged criminal acts and engaged in matters having no connection with it, and were together at the time it was committed, and there is no proven fact or circumstance showing joint motive or any concert of action in its commission, there is no proof of a conspiracy and the court should not instruct the jury upon that issue.

2. Criminal Law—Conspiracy—Evidence—Instructions.—It is prejudicial error for the court to instruct the jury upon the charge of conspiracy when there is not sufficient evidence to authorize the jury to find it to be a fact, although from the nature of the verdict it may appear that the conviction was not under the conspiracy instruction, since it was calculated to magnify the prosecution in the minds of the jury, and, furthermore, some of them may have concluded that there was a conspiracy and thereby were influenced to agree to the verdict of the others rather than suffer a mistrial.

3. Criminal Law—Conspiracy.—Where one of two jointly indicted defendants under a charge of murder is shown not to have conspired with his co-defendant to commit the murder and it is not shown that he participated, aided, abetted or in any manner agreed to the commission of the crime by his co-defendant the court should direct the jury to acquit him.

4. Criminal Law—Arrest for Offense Committed Before Crime—Evidence.—It is error to call the attention of the jury in a trial of an indictment for murder to an arrest of the deceased by one of the defendants in the indictment made many hours before the killing and which had no connection with the homicide which did not occur at the time or grow out of the arrest. It is competent, however, to prove the arrest and the facts and circumstances con-

nected with it for the purpose of showing the state of feeling between the parties; but that fact is substantive evidence like any other proven fact in the case and should be given no special prominence in the court's instructions.

STEPHENS & STEELY and TYE & SILER for appellant Lockard.

STEPHENS & STEELY for appellant Morgan.

CHAS. I. DAWSON, Attorney General, and W. T. FOWLER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing the judgment in each appeal.

The appellants in the above two appeals, Lockard in the one and Morgan in the other, were jointly indicted in the Whitley circuit court, in which they were charged with murdering Wiley Smith. The killing occurred between one and two o'clock a. m. on October 19, 1920, in the city of Corbin on the pavement in front of the Busy Bee restaurant. The first count in the indictment charged the two with committing the murder and the second one charged a conspiracy between them to commit it, and in pursuance thereto they did so. Appellant Lockard was separately tried at the January, 1921, term of the Whitley circuit court and was convicted of the crime of murder and his punishment fixed at confinement in the penitentiary for his natural life. The appellant Morgan was tried at the May, 1921, term and he was convicted of voluntary manslaughter with an attached punishment of eight years' confinement in the penitentiary. Defendants have prosecuted separate appeals with voluminous records in each of them, and upon motion and by agreement of parties they were heard together and will be disposed of in one opinion.

We will first determine what we conceive to be the material errors complained of in the appeal of appellant Lockard, and will then direct our attention to the appeal of Morgan. In both of them it is contended that the motion made by each appellant for a directed verdict of acquittal should have been sustained, and that the court erred in giving to the jury on each trial the conspiracy instruction. There are also objections common to both appellants concerning the introduction of alleged incompetent testimony introduced by the Commonwealth, and perhaps others, also relating to each of the appeals;

but we do not regard any of them, not herein referred to or discussed, of sufficient materiality or prejudicial effect to constitute reversible error, and we will therefore confine ourselves to a consideration of the matters urged for a reversal which we deem sufficient therefor.

Lockard at the time of the killing was, and had been for some time prior thereto, chief of the fire department of the city of Corbin, and while that position did not vest him with the powers and duties of a police officer he seems to have performed those duties in the way of assisting the police of the city in making arrests and preserving the peace with the acquiescence and consent of the chief of police, as well as the city council. Morgan was a duly appointed and acting deputy constable in district number 6 of Knox county, a portion of which lay within the corporate limits of Corbin, which includes portions of both Whitley and Knox counties and, perhaps, a small portion of Laurel county.

Some five or six miles east of Corbin at a place where the railroad crosses the pike running to Barbourville was a store operated by Lockard's son. Some time after supper on the 18th of October the owner of that store telephoned to the chief of police (Mr. Browning) that his store had been broken into by a person named by him, and that the culprit had escaped, and a request was made for the officers of the city to search and be on the lookout for the housebreaker. The office of the chief of police and that of fire chief, Lockard, were close together and the latter was called to the phone and his son had substantially the same conversation with him, whereupon the chief of police instructed Lockard to find the boys (meaning the night chief and the night policeman) and, in substance, to do what was legal and necessary to effect the apprehension and arrest of the person who had broken into the store, the supposition being that he would make his way to Corbin in trying to effect his escape. The night chief was named McHargue and the night policeman was named Weaver. Lockard found the two latter and they concluded it would be proper to take along with them the appellant, Morgan, since he was a constable in Knox county where the crime had been committed, and they eventually agreed for two of them to walk along the railroad to the point where it crossed the pike and for the other two to travel the pike to that point, but the pike crossed over a large hill or mountain called Barbourville

hill, and it was suggested that those who traveled it do so in an automobile. Weaver then made arrangements with deceased, Wiley Smith, to carry two of the officers over the pike, as had been determined upon, but the machine used belonged to Ed Rains, a warm friend of deceased and whose sister was unlawfully living with the latter, who was married to another woman.

Before starting on the trip deceased went to his room and procured a large pistol which he put upon the front seat and which he occupied with Rains, who drove the machine, and appellants occupied the rear seat. Defendants testified that after starting, Smith, whom they claim was more or less intoxicated and which fact is corroborated by other evidence in the case, suggested that he was going to sell them some whiskey but at a very high price. The machine went dead on Barbourville hill, a distance of less than a mile from where the parties started, and all of the occupants alighted therefrom and while efforts were being made by Rains, and perhaps Smith, to remedy the trouble (which turned out to be a scarcity of gasoline) the defendants say that Smith drew a bottle of whiskey and offered it to them but they declined to take any of it, and Morgan, in whose jurisdiction the parties were at the time, arrested him for transporting whiskey in his presence contrary to law. Some angry words were uttered by Smith and finally the parties got back into the machine and let it roll down the hill and when it got on level ground there was sufficient gasoline to run it and they went back to the office of the chief of police to whom Smith was delivered. After some delay he deposited $100.00 with that officer and was released, but during the time he was talking profanely and threateningly about the officers. After he was released he procured his pistol and wandered about town, eventually landing at Kelly's restaurant where there were gathered a considerable number of his pals and intimate associates. It is in proof, but in a very evasive way contradicted by some of the associates of the deceased, that he and one Lewis, a most willing witness for the Commonwealth, made up a purse to purchase a pint of whiskey and that another Commonwealth's witness, equally as willing, carried them away from Kelly's restaurant in an automobile and was gone for some time when they returned. Lewis and the other witness referred to said that they were "just riding around town"

seeing what they could discover. Lockard saw the money the deceased had at the time he deposited the $100.00 with the chief of police for his release, but there is no testimony showing that Morgan knew how much money, if any, deceased had, which, according to the testimony, was some four or five hundred dollars.

After Smith had been delivered to the chief of police the two defendants concluded to walk the pike to the point agreed upon and meet the policemen who had gone around the railroad. The latter had reached the point agreed upon and waited some fifteen or twenty minutes and then started back traveling the pike where they met the two defendants, who had been delayed in the manner stated, about a mile from Corbin, and the four returned to the city, arriving there about 12:50 in the night. They were expected to return on a train which they could board at the station where the railroad crosses the pike and which arrives in Corbin at 12:45, and Smith knew that such was their intention. The officers found that the train upon which they expected to arrive was some forty or fifty minutes late and, wishing to meet it upon its arrival where they might possibly find the housebreaker, they went to the Busy Bee restaurant to get a lunch and were eating it when the deceased appeared armed with two pistols which he carried a part of the time in the belt of his pantaloons and a part of the time one in each hand, and according to the great preponderance of the testimony, they were each cocked.

Returning now to notice the actions and conduct of the deceased before going from the Kelly restaurant to the scene of the killing, it is very unwillingly shown by his friends and associates present and with him there (all of whom, except one, were introduced by the Commonwealth), that he remarked several times that he had to meet the 12:45 train because he wanted to see the officers or the "cops." At the time of making those remarks, and when he first appeared at that restaurant, he had the pistol which was returned to him by the chief of police. Shortly thereafter, and before the train was yet due, he went to his room at the Luddington hotel and soon returned with another pistol. He again repeated, with profanity, his threats against the "cops," stating what he intended to say to them and in which he used language plainly evidencing animus and viciousness toward them, and in which he said that he was going to tell

them about what he thought of their "two-timing" him because of his arrest as hereinbefore recited; but each of the Commonwealth's witnesses said that he was cautious enough to add, "I am not going to hurt them," or "I do not intend to do them any harm." Evidently, however, it appears from even such an unwilling source that he intended to deliver them a tongue lashing phillippic. While deceased was thus waiting at the Kelly restaurant one of the Commonwealth's witnesses reported that the train was fifty minutes late and about fifteen minutes thereafter another one, or perhaps the same one, reported that the "cops" had returned and were at the Busy Bee restaurant; whereupon the deceased immediately started therefor with his two pistols, and arrived there, as we have heretofore described.

There is but little contradiction as to what occurred either in or out of that restaurant, after the deceased arrived there. Directly thereafter he began to accuse the appellants of mistreating him by arresting him and of "two-timing" him, and in doing so he talked very profanely and breathed many threats, which, according to defendants and some of their witnesses, were, in substance, that he would kill them "if they batted their eye." Some of the Commonwealth's witnesses leave off the latter statement, but the testimony upon the whole shows that he was extremely angry and was waiving and pointing his pistols, one being in either hand, and that they were each cocked and his finger on the triggers. No one says that either of appellants made any angry remark to him, or made any character of demonstration toward him, nor did either of them draw or offer to draw a weapon. On the contrary, they and the two policemen say that deceased forbid any one of the four coming near him, and all of them state that a killing would have inevitably resulted had they attempted to arrest him. The proprietor of the restaurant immediately went into the kitchen and there remained. Others who testified for the Commonwealth went out of the building for the reason, as they stated, they expected shooting, though no one had exhibited any weapons except the deceased. Finally the parties made their way to the pavement in front of the restaurant, the evidence being contradictory as to whether appellants preceded or followed deceased. When they got on the outside deceased stationed himself near a corner of the restau-

rant and again began his tirade, accompanied by waiving of his pistols, and turned to Morgan and said: "You G— d— s— of a b—, you done me dirty on the hill, why don't you do it now," whereupon Morgan replied: "I have got my nerve, and you have been threatening to shoot me, and if you want to shoot me, as good friends as we have been, shoot." Some of the Commonwealth's witnesses say that Morgan at that time patted his breast and said: "Blow, damn you, blow," but that remark was denied by him and likewise disproved by a number of other witnesses, although we do not consider the discrepancy very material. After the statement of Morgan to the deceased, whatever it may have been, the testimony shows that the latter turned to Lockard, who was standing to one side, and with a motion of his pistols (some witnesses say they were pointed at Lockard, while others say they were only partially raised, and still others say they were pointed downward toward the pavement), said to him; "There is the G— d— s— of a b— that took my gun, I dare you to move or bat your eye and I will kill you;" whereupon Lockard drew his pistol and commenced firing, and shot five or six times in rapid succession. A greater number of witnesses than to the contrary state that upon the firing of the first shot deceased dropped his pistols, but Lockard states that upon the firing of the first shot the smoke kept him from seeing what was happening to the deceased, or from observing his actions, and that all of the shots were fired within a few seconds, though some of the witnesses state that there was a slight pause between the first one and the others. Lockard claimed that at the time he commenced shooting he in good faith believed that he was in danger of losing his life or suffering great bodily harm, and he therefore relies on his right of self-defense.

Both he and Morgan deny that there was ever any agreement or understanding of any character to either kill or do any harm to deceased, nor is there any circumstance in the record supporting in the slightest degree the charge of conspiracy. The evidence, as detailed by the witnesses, conclusively shows that the shooting by Lockard was an act entirely his own, and that it was brought about in the manner stated, and it is doubtful (though we do not now so decide) if the evidence was sufficient to show *malice aforethought* on his part; but at most sufficient to show him guilty of only voluntary manslaugh-

ter, on the ground that he may have fired too soon, and may have fired more shots than were necessary for his protection under the law of self-defense. But whether so or not it is clear that there was no place for the conspiracy instruction under the facts disclosed by the record, and it was error to give it at either trial though the jury did not convict either appellant under that instruction.

The same conditions as found in this record were presented in the case of Pace v. Commonwealth, 170 Ky. 560. In that opinion we held the evidence wholly insufficient to establish a conspiracy, and further held that, though the defendant was not convicted under the conspiracy instruction, it was error to give it when there was no evidence to support it. In the opinion it is said: "But to establish a criminal conspiracy there must be shown by facts or circumstances a joint assent of the minds of the accused to commit the criminal act charged. Such evidence is wholly wanting here, hence the giving of instruction No. 2 (the conspiracy one) was error." Likewise in that case the defendant was not convicted under that instruction and in disposing of the contention of the Commonwealth that it was not erroneous, for that reason to give it, the court said: "While this is true, the instruction was calculated to magnify the prosecution in the minds of the jury, and though the existence of a conspiracy was not an element essential to the showing of his guilt of manslaughter, we cannot speculate as to whether the jury were or were not influenced by it in finding him a participant in the homicide."

It may be added that some of the jurors may have believed the conspiracy charge, while others did not, and those so believing finally agreed with the others and returned the verdict rather than suffer a mistrial. At any rate, we are not permitted to speculate as to how, if at all, the erroneous instruction operated on the minds of the jurors, and having no support from any of the testimony in the case it should not have been given.

Complaint is also made in the appeal by Lockard of instructions 7 and 8, which attempted to define the rights of appellants in arresting Smith in the early part of the night and for which he was delivered to the chief of police. These instructions are quite lengthy and we are not inclined to encumber this opinion by inserting them herein. They state, in substance, that if the deceased

committed a violation of the law in the presence of Morgan he had the right to make the arrest without a warrant in Knox county, but that he had no right to arrest him in Whitley county, and that in no event did Lockard have the right to make *any* arrest. Instruction 7 further submitted to the jury the question as to whether the arrest was made in good faith, and said to them that if they believed it was made in bad faith and "for the corrupt purpose of taking advantage of said Smith and to inflict death upon him or some bodily harm," etc., "then in that event, the arrest and detention of said Smith was illegal." Clearly, neither of those instructions had any place in the case, and equally clearly they were calculated to influence the jury adversely to the rights of appellant Lockard. The killing for which appellants were indicted did not immediately result from, or occur at the time of, the alleged arrest and they were entirely separate and distinct transactions. Hence the respective rights of an arresting officer and the person sought to be arrested and during the exercise of which the offense was committed, are not involved in this case and it was not necessary to define the duties and the rights of the parties growing out of such conditions. If there was any evidence to show that the arrest was a part of a conspiracy for the accomplishment of some ulterior purpose, or to carry out some criminal design, there might have existed grounds for submitting to the jury the motives for the arrest, but in the absence of such evidence the circumstances relating to that transaction were admissible only for the purpose of showing the state of mind of the parties toward each other and the animus or friendliness existing between them. The arrest in the early part of the night was but substantive evidence like any other pertinent and relevant fact and should not have been specifically pointed out by any instruction.

It was shown that deceased had upon his person while in the restaurant, and immediately before he was shot, a roll of bills supposed to contain about three, four or five hundred dollars, and after he was shot there was none of it found, and it is the theory of the Commonwealth that appellants conspired to kill him for the purpose of robbery. Such a conclusion is founded only on the merest chimerical speculation. No express testimony, or any circumstance in the case, points to its truth. On the contrary, the Commonwealth's witness, Lewis, was

KENTUCKY REPORTS.     [Vol. 193.

indicted for taking the money from the body of the deceased. It is shown that he was among the first who took hold of the body and he searched the pockets and took therefrom their contents, including a pocketbook, and he claimed that he found some dice, a ten dollar gold piece and some other trifling articles. Neither of the appellants was about the pockets of the deceased after he was shot, although Morgan took hold of his shoulders and assisted in straightening out his body. Incriminatory statements are proven on Lewis, and the circumstances show that he more than any one else obtained the money, if any one did. At any rate, there is no foundation for the intimated motive on the part of either appellant, which removes from the case all motive on their part for the commission of the crime of murder.

Before concluding the Lockard appeal, it may be further stated that the evidence admitted by the court to the effect that he, some time in the past, had separated from his wife and was living apart from her was incompetent and should not have been introduced.

2. Briefly considering the appeal by the defendant, Morgan, it should be said that instructions 7 and 8, complained of in the Lockard appeal, were not given at his trial. The conspiracy instruction, however, was given and for that reason alone the judgment against him must be reversed. But, independent of that error, and in the absence of any testimony showing a conspiracy, we have searched the record in vain to find any fact or circumstance connecting him with the shooting of deceased by Lockard. No motive for the killing is shown against him and nothing occurred throughout the fatal night to show that he entertained any evil designs against the deceased, and, certainly nothing happened at the time of the killing to make him an accessory before the fact, or in any wise to connect him therewith as an aider or abettor. It is useless for us to repeat that before one's life or liberty may be taken from him there must be at least some proof that he has committed the crime with which he is charged. The fact that Morgan was present, as were also many others, when Lockard did the shooting, and that he may have been associated with him beforehand, while engaged in entirely independent matters, are not sufficient to support the verdict of conviction, and if the evidence should be in substance the same upon another

trial of the appellant, Morgan, the court should direct the jury to acquit him.

Wherefore the judgment in each appeal is reversed with directions to grant a new trial in each case, and for proceedings not inconsistent with this opinion.