### Evans v. Commonwealth.

(Decided November 1, 1927.)

### Appeal from Bell Circuit Court.

1. Homicide.—Previous threats, made by one charged with murder, against deceased are never admitted as substantive evidence that he committed acts constituting crime.
2. Homicide.—Threats made by one charged with murder are admitted in evidence only on question of malice or who was aggressor, if homicide occurred in a rencounter.
3. Homicide.—General and indefinite threats, like positive, direct threats, are inadmissible as substantive evidence that defendant committed acts constituting crime charged.
4. Homicide.—In murder prosecution, where there was no evidence that defendant assaulted and killed deceased, testimony of state's witnesses that shortly before deceased was killed an unidentified person pointed his pistol at another person and said, "Are you ready to die? I am," and that defendant said to other persons, "I would as leave kill a man as spit, and have the thing to do it with," was incompetent and prejudicial.
5. Homicide.—In murder prosecution, excluding incompetent evidence of defendants threats, evidence was insufficient to establish defendant's guilt of manslaughter.

JAMES M. GILBERT and W. T. DAVIS for appellant.

F. E. DAUGHERTY, Attorney General, and B. B. GOLDEN for appellee.

OPINION OF THE COURT BY COMMISSIONER SANDIDGE—Reversing.

Appellant, William Evans, was indicted by the grand jury of Bell county, Ky., for the murder of Robert Woolum. The jury that tried him found him guilty of manslaughter and fixed his punishment at confinement in the penitentiary for 21 years. He prosecutes this appeal from the judgment of that court so convicting him.

The evidence against him is wholly circumstantial. Mr. Woolum, who was killed, was then the chief of police of the town of Pineville, Ky. He was killed at approximately 10:30 o'clock at night on Saturday, the 16th day of

October, 1926, in about 50 feet of the passenger station of the L. & N. Railroad in that town. A number of people were in and about the station when the shooting was done which resulted in his death. None of the witnesses introduced for the commonwealth were so situated as to see even the flash of the pistol when the shooting was done. Near where Mr. Woolum was killed six empty .44 pistol cartridges were found, and the testimony tends to establish that six shots were fired when he was killed. He was in uniform and armed, but both of his pistols were found in their holsters, evidencing that he had drawn neither of them. His clothing and person were badly powder burned about the place of entrance of two or three of the bullets. A witness for the commonwealth drove past Mr. Woolum in an automobile about a minute before the shooting, at a point about 50 feet from where he was found dying immediately thereafter. By the lights of the car he saw Mr. Woolum and some one whom he did not know and was never able to identify, walking very close together, and apparently talking to each other, and going in the directioin of the point where Mr. Woolum was killed a moment later. He testified that the person with Mr. Woolum was about his size and build and was dressed in dark clothes and was wearing a dark hat. John Mills testified that about 10 minutes before the shooting he and Henry Pritchard were standing on the platform near the passenger station, and that a stranger whom he did not know and was unable to identify, and whom he could not or did not describe, walked up to where he and Pritchard were standing smoking, and asked them if they were going to leave on the train. The stranger then pulled a pistol, apparently a .45 automatic, from his left front pocket and pointed it toward him and said something about dying, or something like, "I don't care for dying, do you?" This testimony was admitted over the objection of appellant.

Tony Haggard and Elmer Woods testified that 30 or 40 minutes before Woolum was killed they were at the station waiting for the train going to Corbin. A person they had never known came to where they were and said, "I thought you were two shines standing there;" and, to quote their testimony:

> "And he says that he would just leave kill a man as spit, and said he had the thing to do it with, and when he said that he pulled his coat back on the left side, and I seed his gun, about half of his gun."

They identified appellant, Evans, as this person. This testimony was admitted over the objection and exception of appellant:

It was proved by the negro porter who works for the railroad company at the station that he saw appellant, Evans, standing in the general waiting room of the station about 10 o'clock. It was shown by a witness, who went to the station to meet a kinswoman expected on a train due to arrive at 8:13, but which was shown to have been 17 minutes late that night, that while there he saw appellant, Evans, look through one of the windows into the station. Appellant was shown to have gone into the business section of Pineville about 6 o'clock on the Saturday evening in question. He and two young men by the name of Bingham were in company with each other at a barber shop, and left there together about 7 o'clock. They went to a little mercantile establishment operated by Buck Teasley, and there were joined by two other young men. Appellant had stopped at Teasley's store earlier in the evening and left a .44 automatic pistol there while he went to town. While there the first time he purchased a 4-ounce bottle of pear extract and a bottle of pop and went into a back room. Teasley, who testified, did not know whether he took a drink, but appellant testified that he did. When he and the two Bingham boys returned to Teasley's establishment appellant repossessed himself of his pistol, and while there on this occasion purchased another 4-ounce bottle of pear extract. This concoction is shown to contain about 50 per cent. of alcohol. Shortly afterwards appellant and the two Bingham boys and the two others who had joined them left Teasley's establishment, and, according to their evidence, proceeded to a place on the mountain side and began to play poker, using candles for light. They played until shortly after 8 o'clock when a threatened rainstorm broke up the game. They all returned to Teasley's establishment, and appellant and the two Bingham boys entered, the other two going on to their homes. The two Bingham boys left there shortly afterwards with the announced intention of going into town. Shortly afterwards appellant left.

The four who played poker with appellant testified that while they were playing he produced and each of them took a small drink from one of the bottles of pear extract. Appellant testified that that and the first drink he took were the only two drinks he had that night, and that they were so small as to have no effect upon him.

His companions in the poker game testified that he did not appear to be drunk, though he exhibited some evidence that he was drinking. A negro who lived a few feet from the Teasley establishment testified that when appellant left that place he passed his home and engaged in a short conversation with him. What they said appears to have no bearing on the homicide. Appellant then went to the home of Mr. Trosper, who lived about 50 yards from the home of the negro, and talked with him about renting his house. He was shown and looked over the house, and Mr. Trosper testified, and the testimony of appellant agreed, that while he was there the train from Corbin arrived at Pineville, and that they were on the porch when it passed. Mr. Trosper's house is alongside the railroad right of way. This train was due at 8:13 and was shown to have been 17 minutes late that night.

The two Bingham boys testified that when they left appellant at Buck Teasley's, he told them to wait for him at a certain restaurant or certain pool room in town, as he would be over there shortly. Buck Teasley, the negro, whom he met immediately after leaving Teasley, and Mr. Trosper, whom he left shortly after the train ran, all testified that he remarked to them in leaving that he believed he would go over to town awhile. The two Bingham boys both testified that, though they waited about the restaurant and pool room designated for a considerable length of time, appellant did not come and they did not see him again that night. From the place where appellant left Mr. Trosper and went upon the railroad right of way following the railroad one way would lead to the passenger station near which Mr. Woolum was killed, and the other way would lead to his home, that being one of the several routes that he might have taken to go home from Mr. Trosper's.

Ulyss Philpot testified that on Saturday night, the week preceding the killing of Mr. Woolum, he and appellant had arranged for a poker game. They were crossing the bridge leading to the station where Mr. Woolum was killed and met Mr. Lockhard and Mr. Messer, both of whom were members of the Pineville police force, and then had on their uniforms and badges. As the policemen passed he suggested that they were liable to see the lights on the hill if they played poker where they had agreed; and appellant then put his hand on his pistol on

his hip and said, "They are liable to get this." This testimony was admitted over the objection and exception of appellant. The six empty pistol cartridges found near where Mr. Woolum was killed were introduced in evidence. Appellant owned and when arrested had at his home a .44 automatic Colt's pistol. Empty cartridges fired from his pistol subsequent to his arrest were introduced in evidence, and testimony was heard tending to establish that the .44 pistol owned by appellant, due to wear of the firing pin, makes an impression in the cap or primer of the cartridge to one side rather than in the center as is true of a new pistol.

The testimony of Capt. Helton, the sheriff of Bell county, the only one of the witnesses who appears to have had enough experience to qualify him as an expert on the question, was to the effect that the firing pin of any .44 automatic Colt's pistol, subjected to a like amount of wear as that owned by appellant, would doubtless likewise strike the cap or primer to one side rather than in the center. Appellant's pistol appears to be the regular army model .44 Colt's and the evidence establishes that many guns of that type and model are in use in the vicinity where this tragedy occurred. There was nothing distinctive about the mark made by appellant's pistol on the shells fired by it, and a number of the same caliber shells fired from other pistols were introduced in evidence by the defendant. The impression made by the firing pin in the cap or primer of the cartridges was also to one side rather than in the center. The commonwealth introduced no evidence which in the least tended to establish that appellant entertained ill feeling, hatred, or malice toward Mr. Woolum, or that there had ever been any character of trouble or difficulty between them. On the other hand, it appears that appellant's father was a member of the city council of Pineville, and not only voted for but advocated the election of Mr. Woolum as chief of police by that body.

The foregoing are the only facts and circumstances of probative value introduced by the commonwealth upon which the verdict of guilty herein was founded. It is insisted for appellant that the trial court was in error in permitting the evidence of Haggard and Woods, and that of John Mills, and that of Ulyss Philpot, objected to as noted above, to go to the jury.

Previous threats, made by one charged with murder, against the person he is charged with having murdered are never admitted as substantive evidence that he committed the acts constituting the crime. Threats are admitted in evidence only as being competent on the question of malice, or on the question who was the aggressor, if the homicide occurred in a rencounter.

In Daniel v. Commonwealth, 170 Ky. 693, 186 S. W. 489, the only circumstance tending to connect Daniel with the assassination of Will Clardy, for whose murder he had been convicted, was the fact from the testimony of a single witness that some 8 months previously Daniel and Clardy had an altercation, during the course of which the former struck at and snapped a pistol at the latter and threatened to kill him if he ever bothered with the Jefferson woman again. In that opinion it was said:

"In the prosecution of one accused of a homicide, it is always competent to prove any threat of violence made by the accused against the deceased, because it is competent evidence to be considered in determining whether the slaying was done with malice, and in cases where homicides have occurred as the result of rencounters, to assist the court in determining which party brought on the rencounter. The threats proved, as made by appellant, in the case at bar, if true, would be evidence tending to show the state of his mind as regards the deceased, and of a motive for the perpetration of the crime, but it is impossible to see how such evidence, alone, would conduce to prove the actual perpetration of the acts which constitute the crime."

The judgment in that case was reversed and the trial court was directed peremptorily to instruct the jury to find defendant not guilty if upon another trial the evidence should be the same. This because previous threats are not evidence of the fact that accused, who uttered them, killed the object of his threats.

None of the testimony complained of as erroneous and prejudicial, which the trial court admitted over appellant's objection, was a threat made by appellant against Mr. Woolum, whom he is charged with having murdered. Two of the witnesses testified that, exhibiting his gun to them, he stated, "He would as leave kill a man as spit, and he had the thing to do it with." In another instance

a person, not even identified as appellant, is said to have pointed his pistol at the witness and inquired of him, "Are you ready to die? I am." In the other instance, what Philpot testified he said might, by strained construction, be held to be a conditional threat that if policemen interfered with him while engaged in gambling he would use his gun on them. General and indefinite threats, like positive, direct threats, are never admissible as substantive evidence that the accused defendant has committed the acts constituting the crime charged. The rule with reference to general threats and their admissibility in evidence was written in these words in Ellis v. Commonwealth, 146 Ky. 715, 143 S. W. 425:

> "As we understand the rule evidence of a threat, or a general threat to do violence to some person or persons, although the declarant may not mention the name of any person, and the witness may not know what person or persons the threats are directed against or have reference to, is competent as showing malice and ill will either general or personal, when, shortly after the threat is made, the declarant carries the threat out by an attack or assault on the person he is being prosecuted for assaulting. The subsequent assault shows that the declarant in threatening to do violence had malice and ill will towards everybody or towards some particular person, and, evidence of the threat is competent to show general malice and ill will and a general desire to commit violence, or malice and ill will towards the person who is the subject of the assault."

Numerous other opinions from this court sustaining that rule are cited and quoted from in the Ellis opinion. General threats are admissible under the rule only when made so close in point of time to the acts constituting the homicide that the inference can be drawn from that fact that the victim was the object of the threats.

Here we find in the record no evidence at all conducing to establish that appellant fired the shots which killed Mr. Woolum. The commonwealth introduced the evidence objected to, and the trial court overruled appellant's objection to it apparently upon the theory that evidence that shortly before Mr. Woolum was killed an unidentified person, not shown to have been appellant, pointed his pistol at another person and said, "Are you

ready to die? I am;" and that appellant said to two other persons, "I would as leave kill a man as spit and have the thing to do it with," was substantive evidence that appellant killed Mr. Woolum. As we have seen, such is not the case. For lack of evidence that appellant assaulted and killed Mr. Woolum, the evidence to which we have referred was incompetent. The evidence that appellant had threatened Mr. Woolum, if any could be produced, and evidence that he had uttered general threats, as evidence of previous malice or as evidence that he was the aggressor in a rencounter, is incompetent until there is evidence that he killed him or engaged in a rencounter with him resulting in his death. This evidence necessarily must be held to be prejudicial.

With this evidence excluded, the court is constrained to the view that there is not sufficient evidence tending to establish appellant's guilt of the crime with which he is charged to take the case to the jury. The fact that appellant owns a .44 automatic Colt's pistol and was shown to have been about the station some 20 or 30 minutes before Mr. Woolum was killed is not sufficient. A great many other people are shown to possess pistols of the same kind and caliber. A number of other people also are shown to have been at the station at the time of and shortly before this tragedy. If, upon another trial, the commonwealth cannot produce evidence of some fact or circumstance tending to establish that appellant fired the fatal shots which killed Mr. Woolum, the evidence complained of will not be permitted to go to the jury, and the court will peremptorily instruct the jury to find the defendant not guilty.

For the reasons indicated, the judgment is reversed and cause remanded for other proceedings consistent with this opinion.