## Watkins et al. v. Commonwealth.

(Decided May 25, 1928.)

G. DUNCAN MILLIKEN for appellants.

J. W. CAMMACK, Attorney General, and S. H. BROWN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Affirming in part and reversing in part.

On October 17, 1924, some one slew Volney Harrison. Bradley Watkins and Warner Hunton were charged by indictment with his murder, and now are asking for the reversal of a judgment imposing upon each of them three years' imprisonment for manslaughter.

In October, 1924, Volney Harrison was living in Butler county, Ky. A protracted meeting was being held at Cave Spring Church in Logan county, about eight miles from Harrison's home, but it appears that Harrison was attending these meetings, at least, he was among those present, though it does not appear that he went inside the church. It is about 60 feet from this church to the fence in front of it. There are two doors to the church. As you approach the church, the door on the right is referred to as the men's door; the door on the left is referred to as the women's door. The gate in the fence is in front of the women's door. About half way between the gate and the women's door, there is a sugar maple. There is a path leading from the gate to the church, which passes to the right of the tree as you face the church, and which leads to the women's door. There seems to be another path that leads off from this one to the men's door, but this does not appear to be as well defined as the path leading to the women's door. This meeting was well attended, the church appears to have been comfortably full, and there were about as many on the outside as on the inside.

The first account we get of Harrison in the evidence was that on Sunday night, October 12, he was there, and seemed to be drinking. He was near the sugar tree, and was in a quarrel with some young man. Harrison was swearing, and they were quarreling—something about paying for a drink. The fellow said to Harrison, "I am not going to fight you; you have knucks on." The next time we hear of him was on the night of Thursday, the 16th. Fifteen or twenty men were in a crowd outside of the church, and Harrison was in the crowd, cursing and swearing. He said he had a wife and baby dead and in hell, and he had as soon go to hell from Cave Spring Church as anywhere else.

No witness to this time had connected either Bradley Watkins or Warner Hunton with Harrison. On Thurs-

day, the 16th, Bradley Watkins had T. J. McConnell, a jeweler and gunsmith, make some repairs on a Smith & Wesson .32 pistol and remarked at the time that it was an old gun that "another party" had sent by him for adjustment. McConnell repaired the pistol, and put upon it his initials and the date he made the repair. McConnell fired the pistol once to see if it was in working order.

John T. Proctor sold Bradley Watkins 50 cents worth of .32 short cartridges some time between Sunday and Friday of that week. George Corbin attended the meeting on Friday night. He saw Bradley Watkins and Warner Hunton at the door steps, and said to them, "Boys, let's go in the house." Bradley Watkins said, "All right." Warner Hunton said, "No; he may come after while." Those two did not go in. They must have been waiting for some one, for the services had begun, and the second hymn was being sung. Lloyd Thomas came to church with Harrison that night. They arrived at 7:30, and at first went to the side of the church, and were looking in the window. Thomas was not acquainted with the defendants. Later, Thomas was under this sugar tree. A group of men was between him and Harrison. He says the flash came between this crowd and the fist fight. Another witness who came to church with Harrison says they first went to the window; that, when he left the window, he came to this sugar tree where Harrison was quarreling with Warner Hunton. This witness fixes the time of this trouble at 8 o'clock. Thus it would appear that Harrison was shot about 30 minutes after he got to the church. This witness says the fist fight lasted for one or two minutes after the shooting. Lois Corbin saw the defendants in the churchyard just before the trouble came up. Verner Bobbitt says the defendants were near this path when the fist fight began, and a few steps from the gate. McGowan says they were close by, and that, after the shooting, they separated him and Sam Hunton. Verner Bobbitt testified he was standing talking to Volney Harrison near the sugar tree, and Warner Hunton came up and said to Harrison: "I understand you are going to run me out." Harrison replied, "Don't put your hand on me, and I don't mean maybe." Harrison was cursing and swearing.

There is some conflict in the evidence as to whether Warner Hunton went into the church and called out his father, Sam Hunton, one of the deacons, or whether Sam Hunton came out because he was attracted by the offen-

sive language. Anyway, Sam Hunton came out, and, approaching Harrison, said to him, "My friend, what is the matter out here? Why do you keep so much noise and disturbance You ought not to carry on so on the church ground." Harrison said, "I am not swearing any more than anybody else," Sam Hunton said to him, "I have heard that you are getting up a disturbance with the Cave Spring boys, and I have come out to make you leave. If you can't behave yourself, get out of the churchyard." Harrison said, "I have not done anything to leave for, and I am not going. If you want to talk to me, come out in the road or come outside in the woods." Sam Hunton said to Harrison, "Do you accuse these boys of cutting up your automobile" Harrison replied, "They were in the bunch, and whoever cut up my automobile is a son of a bitch." Sam Hunton insisted that Harrison either behave himself or leave the premises, and Harrison left, again inviting Hunton to follow him out into the road or into the woods. During the progress of this quarrel, Bradley Watkins was present, and he remarked, "I had as soon follow lead tonight as any time."

Gene McGowan, who was standing near, taunted Sam Hunton for not accepting Harrison's challenge, and said to Sam: "I am for the right. Why don't you follow him?" "Go down in the woods with him; why don't you go on with him?" Sam Hunton replied, "If you are going to take up for him, you get off the yard." McGowan said, "I am not going to leave." About that time Gene McGowan and Sam Hunton got into a fight. It was an old-fashioned fist fight, up and down, first Gene up and then Sam, then Gene down and then Sam. The fist fight soon drifted over to the front of the men's door, and, when it closed, and the two participants were separated, they were directly in front of, and about ten feet from, the door, but it seems to have begun near this sugar tree. Watkins and Warner Hunton were present at the time of the trouble with Harrison and the outset of the quarrel between McGowan and Sam Hunton. While this fist fight was in progress, Harrison, who had got near the gate, called back to McGowan, "Wait, Gene, till I get there," and started toward the fist fight. About that time a shot was fired, and Harrison fell about three feet to the right of this path. He was almost midways between the fence and the church; perhaps a little nearer

the fence. He was about ten or twelve feet from where the fist fight closed and the parties were separated. No one knows who fired this shot, but there is evidence from one witness that it came from this bunch, and, when the witness was asked, ''What bunch?'' he said, ''From the bunch Bradley Watkins, Gene McGowan, and Hunton, it came from them.'' In one or two minutes after the shot was fired, Bradley Watkins and Warner Hunton separated McGowan and Sam Hunton, and the two made friends.

There were 30 or 40 people, perhaps more, outside the church and around and in the neighborhood of this fight and this shooting. No one seemed to know who did the shooting. This fatal shot was fired from between the sugar tree and the path. The defendants were there. They did not testify. It seems to be agreed that the fatal shot came from near the sugar tree. The ball passed through the edge of a cap that Harrison was wearing and entered his left temple. The cap was powder burned. Harrison died about 11 o'clock without regaining consciousness. The sheriff sent to the home of Watkins, and got out of a bureau drawer the pistol that McConnell had repaired. There were four loaded shells in it, and one empty shell. Four of the shells were cankered, and one shell was bright and fresh. The evidence does not disclose whether this bright shell was a loaded or an empty shell. Immediately after this shooting, the crowd scattered in all directions. Many went into the church. Among those were Bradley Watkins and Warner Hunton. In a few minutes some came out and endeavored to render aid to the wounded man. Directly after the shot was fired, a horse came out of the bushes and ran rapidly in the direction of Richelieu. Whether or not a rider was on this horse is not known. Watkins had gone home before the sheriff went to his home and got this pistol. Some of the witnesses who examined the pistol, and who gave some evidence of being experts, testified it had been recently fired, while others who gave equal evidence of experience testified that from their examination of the gun they were convinced that it had not been fired for some time, because they were able to get red rust out of the barrel, but the correctness of their conclusion is overcome by the positive statement of McConnell that he had fired the pistol the day before, when he repaired it.

In a case of this kind, the verdict of the jury must stand, and the defendants must undergo the punishment

imposed, unless there appears in the record some error of the court which probably caused the jury to reach an erroneous conclusion. See Green v. Com. (Ky.) 4 S. W. (2d) 1109; Maxey and Warner v. Com., 219 Ky. 745, 294 S. W. 507.

We will now examine what the defendants allege were errors of the court. They first direct our attention to the indictment to which they demurred, and, the court having overruled their demurrer, they allege that that was error. At the conclusion of a perfectly good indictment charging both of these defendants with the murder of Harrison, there was added these words:

> "And each did aid, counsel, procure, abet, and assist the other in the said willful, felonious, malicious shooting, wounding and killing of the said Harrison."

It is the addition of these words which the defendants contend made the indictment bad; but, while discussing and complaining of them, they have cited no authority in support of their position, further than to say that the indictment should in one count have charged Watkins with the murder of Harrison, and Hunton with aiding and abetting therein, and, in the second count, have charged Hunton with the murder and Watkins with aiding and abetting, instead of containing but a single count charging each of them, as it did, with the murder, and each of them with aiding and abetting the other. Their position is very similar to the position taken in the case of Howard v. Com., 110 Ky. 356, 61 S. W. 756. In that case, the court thus stated the position of Howard:

> "Appellant complains of the indictment because it charges him with being the principal, and at the same time of being the aider and abettor of the four other persons named therein, and of another person then and there acting with them, but who is to the grand jury unknown, in the commission of a crime which was the result of a single act, the firing of a single shot."

Not only is the position taken by the defendants here similar to the position taken by Howard there, but the indictment in the Howard case is very similar to the indictment in this case. As the indictment in that case was upheld, then it would follow upon the authority of that case that this indictment is not bad. By section 122 of

the Criminal Code, an indictment is required to be so drawn as to enable a person of common understanding to know what is intended; that is, it must inform the defendant of the nature of the offense with which he is charged. By section 126 of the Code, the inclusion of more than one offense in an indictment is forbidden, except in certain cases, but it is provided that, if the crime may have been committed in different modes and by different means, the indictment may allege such mode and means in the alternative. If this indictment had been drawn as the defendants now suggest, the only information it would have conveyed to them would be that Watkins had killed Harrison and Hunton had assisted him, or that Hunton had killed Harrison and Watkins had assisted him. They would not have known which one of them the commonwealth would endeavor to establish did the killing, nor would they have known which one of them the commonwealth would endeavor to establish did the assisting. They admit that, if these charges had been made in separate counts, that would have been good, but we cannot see why they did not get exactly that same information from the indictment as it was drawn. We cannot understand how they would be in any better position, would know any more about the crime charged against them, or be better able to prepare their defense, if this indictment had contained in two, three, or more counts the same information, and the same charges here made in one count. The indictment without these added words was good, and, if the commonwealth had established the things alleged, the conviction would have to stand.

In the case of Benge v. Com., 92 Ky. 1, 17 S. W. 146, 13 Ky. Law Rep. 308, Jerry Hampton and others were indicted for the murder of Joseph Bowling; Benge being indicted as an aider and abettor. The proof showed that Benge did the killing. The court instructed the jury they could find him guilty as the actual perpetrator of the deed, notwithstanding he was indicted as an aider and abettor only. The court in that case discussed that feature, and in its opinion said:

"There is but the one crime charged, that of murder by all the defendants. . . . The one charged as principal may be found guilty of aiding and abetting; and the one charged as aider and abettor may be found guilty as principal. This is for the reason that each is the agent and instrument of the

other, and his act is the act of the other, and the act of each constitutes but one crime, and each is guilty of the act actually committed by the other; such act is in law, the act of each.''

This case was followed in the cases of Higgins v. Com., 142 Ky. 647, 134 S. W. 1135; Fleming v. Com., 217 Ky. 485, 290 S. W. 339, and has been cited with approval in the cases of Fox v. Com., 202 Ky. 41, 258 S. W. 950; Ratliff v. Com., 182 Ky. 246; 206 S. W. 497; Hollin v. Com., 158 Ky. 427, 165 S. W. 407, L. R. A. 1915E, 608; Terhune v. Com., 144 Ky. 370, 138 S. W. 274; Vance v. Com. (Ky.) 115 S. W. 774; Reed v. Com., 125 Ky. 126, 100 S. W. 856, 30 Ky. Law Rep. 1212; Com. v. Hargis, 124 Ky. 356, 99 S. W. 348, 30 Ky. Law Rep. 510; Drake v. Com., 96 S. W. 580, 29 Ky. Law Rep. 981; Leger v. Com., 74 S. W. 704, 25 Ky. Law Rep. 4; Howard v. Com., 110 Ky. 356, 61 S. W. 756, 22 Ky. Law Rep. 1845; Hatfield v. Com., 55 S. W. 679, 21 Ky. Law Rep. 1461.

In Greenwell v. Com., 125 Ky. 192, 100 S. W. 852, 30 Ky. Law Rep. 1282, the case of Com. v. Patrick, 80 Ky. 605, 4 Ky. Law Rep. 660, was held not to be authority under our present statute, and a similar ruling regarding the Patrick case was made in the case of Com. v. Lawson, 165 Ky. 4, 176 S. W. 359. In both of those cases, the case of Benge v. Com., supra, was cited with approval. From the authorities cited, it is evident that the principles announced in the Benge case have become the settled law of this commonwealth, so we will now return to the question as to what effect the addition of the words quoted above could have had upon what we have said was an otherwise good indictment. We have not been able to find any case in this state wherein this court has passed on this question, nor have we been able to find any great amount of authority in other states, but we find that the Missouri Statute (section 3689) is:

''An accessory, before or after the fact, may be indicted, tried and punished, notwithstanding the principal felon may not have been arrested, tried and convicted.''

The similarity of that statute to our section 1128 is very noticeable, and the Missouri court in the case of State v. Stacy, 103 Mo. 11, 15 S. W. 147, had before it a similar question. The trial court had sustained a de-

murrer to the indictment, and, upon appeal, the Missouri court said:

> "It may be contended that the indictment is contradictory in first alleging that Sprague shot and killed the deceased, and that Stacy advised and incited him to do the act, and then concluding by alleging that Sprague and Stacy killed and murdered the deceased. There is no merit in this contention, however. Under our Criminal Code, all distinction between principals and accessories before the fact have been abolished, and an accessory before the fact can be indicted and convicted as a principal."

We are disposed to treat the words which we have said were added to a good indictment as mere surplusage, and it is well known that surplusage, which can be disregarded and eliminated without affecting the main charge, contained in the indictment, will be disregarded. In saying this, we are fully aware that surplusage that is repugnant to, or contradictory of, the main charge contained in the indictment would render the indictment bad, but there is nothing in these words that is contradictory of or repugnant to the remaining part of the indictment. The defendants were charged with the murder of Volney Harrison. Then these words were added wherein they are both charged with assisting and abetting each other therein, which is not contradictory or repugnant to the remainder of the indictment. We therefore conclude the court did not err when it overruled the demurrer filed by the defendants, nor did the court err when it overruled the motion of the defendants to require the commonwealth to elect. There can be no election, unless there be two crimes charged between which to elect. There was but one charged, and that was murder.

Defendants allege that the court erroneously permitted the commonwealth to try the defendants together after it had elected to try them separately, but there is nothing in the record to show the commonwealth ever made such an election. Hence there is no occasion to now determine whether or not that was error.

In their motion and grounds for a new trial, they complain of the action of the court in admitting and rejecting evidence, but they have not thought enough of this ground to discuss it. Errors complained of in motion and grounds for new trial and not discussed in brief are waived. See Caudill v. Caudill, 212 Ky. 433, 279

S. W. 656; McCorkle v. Chapman, 181 Ky. 607, 205 S. W. 682; Cloyd v. Com., 212 Ky. 178, 278 S. W. 595.

Another ground on which they sought a new trial was that they had discovered a witness, Irene Johnson, whose affidavit they filed, in which she swears that Nobic Johnson, her erstwhile husband, told her before they separated that he had killed Harrison. It is not worth while for us to go into a discussion of the admissibility of this woman's evidence, for such a statement would be hearsay, and inadmissible anyway. Hence there is nothing in that contention.

Their next complaint is directed to the instructions, but we have carefully examined them, and find that they fully presented the law of the case, and that there is no merit in this ground.

The defendants have two other grounds for a new trial, which practically amount to the same thing; that is, the question of the sufficiency of the evidence to sustain the verdict. Formerly we were not allowed to review the rulings of the trial court on a motion for a new trial, but, since the Act of March 23, 1910 (Acts 1910, c. 92), amending section 281 of the Criminal Code, we have in the case of Day v. Com., 197 Ky. 730, 247 S. W. 951, and in other cases cited in that opinion, and many cases since, consistently held that, if the verdict of the jury is palpably against the evidence, a reversal for refusing to grant a new trial will be ordered. The sufficiency of this evidence has given us more concern than anything else connected with this appeal. We have therefore decided to briefly review the evidence. The evidence shows Harrison was shot and killed. It shows that he had had trouble with some one on Sunday night, that subsequent to that Watkins had had a pistol repaired, and had secured some ammunition; that Harrison had had trouble again on Thursday night with some one; that Watkins and Hunton were at the door of the church on Friday night, apparently waiting for some one, and, when invited to go into the church, Watkins assented, but Hunton demurred and said, "He may come after while." After a while, Harrison came, and in a few minutes Hunton was in a quarrel with him. Harrison seemed to be accusing some one of cutting up his automobile. The elder Hunton asked Harrison, "Do you accuse these boys of cutting up your automobile?" Harrison said, "They were in the bunch, and whoever cut up my automobile is a son of a bitch."

According to one witness, Hunton and his father ordered Harrison off the grounds. All agree that Harrison was ordered off. Harrison started away. Ray Langlin started with him, and Clarence Thompson, who had come to church with Harrison, had started off the grounds at about the same time. A fist fight then arose between McGowan and Sam Hunton, and, although Watkins and Warner Hunton were then present, they took no part in that fist fight, and made no effort to separate the participants, but apparently were holding themselves in reserve for something, possibly to see what Harrison and his companions were going to do. Soon Harrison called to McGowan to wait till he got there. He started to the fist fight, and was almost immediately killed. The physical facts indicate that he was shot by some one on his left as he was going to the fist fight. Whoever shot him was in close proximity to him, because his cap was powder burned. He was shot, and he fell not far from this sugar tree. Watkins and Hunton were under the sugar tree at the time. The only witness who undertakes to say with any degree of certainty who did this shooting was Verner Bobbitt, and he says this shot came from the bunch, and, when asked who was in the bunch, said, "Bradley Watkins, Gene McGowan, and Hunton." We cannot know whether he referred to the defendant, Warner Hunton, or his father, but Gene McGowan and Sam Hunton are eliminated by the fact that they were too busy knocking each other down to have time to shoot any one, so that leaves Bradley Watkins and Warner Hunton as the only two in the bunch that could have fired the shot. Bradley Watkins had a pistol, which the evidence showed had been recently fired. The wound produced on Harrison was such a wound as would be produced by a pistol of that calibre. As soon as Harrison fell, the anxiety which had probably kept Watkins and Hunton from interfering with the fist fight previous to that time was relieved, and they immediately rushed to, and separated, the participants in the fist fight. In the cases of Anderson v. Com., 205 Ky. 369, 265 S. W. 824; Lockard v. Com., 193 Ky. 619, 237 S. W. 26; Partin v. Com., 197 Ky. 840, 248 S. W. 489; Hall v. Com., 149 Ky. 42, 147 S. W. 764; Saylor v. Com., 158 Ky. 768, 166 S. W. 254; Sipes v. Com., 221 Ky. 603, 299 S. W. 183; Evans v. Com., 221 Ky. 648, 299 S. W. 553; Holmes v. Com., 218 Ky. 314, 291 S. W. 383; Forgy v. Com., 219 Ky. 177, 292 S. W. 799; and in perhaps other cases, we

have reversed the judgment for insufficiency of the evidence.

There was evidence from which the jury might believe that this homicide was committed by one of these two men, and was committed with the pistol that belonged to Watkins. If the jury believed that Watkins did the shooting, the evidence would support the verdict against him, or, if the jury believed Hunton did the shooting with the pistol that had been furnished by Watkins, then, under the authority of the case of Christie v. Com., 193 Ky. 799, 237 S. W. 660, 24 A. L. R. 599, that was sufficient to hold Watkins, but, in order to hold Hunton, there must be some evidence of his participation. It would seem from the case of Hall v. Com., 219 Ky. 446, 293 S. W. 961, that mere presence is not sufficient. There must be some aid or assistance in the homicide. See Watkins v. Com., 123 Ky. 817, 97 S. W. 740, 29 Ky. Law Rep. 1273; Howard v. Com., 110 Ky. 356, 61 S. W. 756, 22 Ky. Law Rep. 1845; Morris v. Com., 11 S. W. 295, 10 Ky. Law Rep. 1004; Hammonds v. Com., 8 Ky. Op. 796; Dudley v. Com., 8 Ky. Op. 356.

In Delaney v. Com., 25 S. W. 830, 15 Ky. Law Rep. 797, we approved an instruction which said an aider and abettor could be convicted if "he was present at the shooting and killing, and, in his mind or will, assented thereto, and by words or conduct, at the time, encouraged said party to shoot or kill the deceased."

In Mitchell v. Com., 14 S. W. 489, 12 Ky. Law Rep. 458, we said it was not necessary, to constitute aiding and abetting, that such aiding be by force and arms. In Johns v. Com., 3 S. W. 369, we affirmed the conviction of Johns who had actively instigated the trouble. In Powers v. Com., 110 Ky. 386, 61 S. W. 735, 63 S. W. 976, 22 Ky. Law Rep. 1807, 23 Ky. Law Rep. 146, 53 L. R. A. 245, we held that, if the defendant advised, counselled, or encouraged the killing, and the killing was induced thereby, he was guilty.

In Thompson v. Com., 58 Ky. (1 Metc.) 13, we held it was not necessary that one should inflict the mortal wound to make him guilty of murder, but that it was sufficient if he was present, aiding and abetting the act, or if he advised and counselled the commission of it. The effect of our opinion in Plummer v. Com., 64 Ky. (1 Bush) 76, was to hold that the mere fact that one may be in sympathy with the principal committing the homicide does not constitute participation in the crime; that the

mere fact that one was present, and at least did not object to the homicide, is not enough to render him a participant.

In Jenkins v. Com., 1 S. W. 154, 8 Ky. Law Rep. 54, we held, where a man had been killed in a melee, in order to convict a person charged with the killing, it was necessary to prove either that he struck the fatal blow or aided and abetted the one who did. In the case of Omer v. Com., 95 Ky. 353, 24 S. W. 594, 15 Ky. Law Rep. 694, we condemned an instruction by which the jury were in effect told that, if Oliver was fired upon and killed by some one other than Omer, with Omer's knowledge or consent, the defendant was guilty, because that instruction did not require it to be Omer's previous knowledge or consent. Of course, Omer knew at the time the firing was going on that it was being done, and the instruction was erroneous because it did not limit this to previous knowledge of Omer.

In the case of Bossey v. Com., 16 S. W. 713, 13 Ky. Law Rep. 217, we held there was not sufficient evidence to connect Bossey with the shooting of Larkin Bird by Henry Miller; the evidence in that case being that Bossey and Bird had guns drawn on each other. Bird directed Bossey to drop his gun, which he did, whereupon Bird advanced on Miller, who shot and killed him.

We condemned the eighth instruction given in the case of Chittenden v. Com., 9 S. W. 386, 10 Ky. Law Rep. 330, because that instruction told the jury that the mere presence of Chittenden at the difficulty was such aid to his father-in-law, who did the killing, as to render Chittenden guilty. In the case of Smith v. Com., 11 Ky. Op. 774, 4 Ky. Law Rep. 353, we held that, when a party present is merely passive, and neither aids nor abets, advises, or encourages the killing, he cannot be said to be guilty of murder. We have also considered this question of the sufficiency of the evidence to sustain a conviction for aiding and abetting in a homicide in the recent case of Combs v. Com., 6 S. W. (2d) 1082, 224 Ky. 653.

Here there was no evidence that Hunton had a pistol or that he knew that Watkins had a pistol; that Hunton fired a shot or knew Watkins was going to fire; that Hunton did anything to encourage Watkins to fire the shot, or aided or assisted him in any way whatever, further than this, that he was there with Watkins, and that the evidence indicates that one of them shot the deceased. If, on another trial of Hunton, there be no more

evidence produced against him than on this, he will be entitled to a directed verdict of acquittal. The jury is the judge of the weight and sufficiency of the evidence, but a man cannot be convicted on mere suspicion. There must be some evidence to sustain the verdict. The nearest approach to this case is the Johns case, supra, but a reading of that case will show that a much stronger case was made out against him than against Hunton.

The judgment is affirmed as to Watkins and reversed as to Hunton.