## Howard v. Commonwealth.

June 20, 1947.

Ray C. Lewis, Judge.

Hiram H. Owens for appellant.

Eldon S. Dummit, Attorney General, and Paris Swinford, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Reversing.

Appellant, Reid White, Hardin Sams, J. B. and Ed Gregòry were charged with having murdered Woodrow Jarvis, and alternatively, each separately, with having been present, aiding and abetting. The indictment was transferred to Laurel County for trial. Following motion for severance, the commonwealth elected to try appellant, the jury returning a verdict of guilty, fixing the penalty at life imprisonment. While numerous grounds were set up in motion for new trial, it is now contended that the court erred: (1) In refusing to sustain appellant's motion for peremptory at the conclusion of the commonwealth's and all evidence; (2) in giving instructions to the jury which were erroneous and prejudicial; (3) in admitting incompetent evidence.

Aside from wholly circumstantial evidence upòn which the commonwealth relied, the proof is that there was on Friday, July 26, 1946, a poker game on a hill near Goose Creek, in which Howard and a number of others were engaged; a minor difficulty arose between Howard and deceased, and thereafter Jarvis left the place where the game was in progress. On the following Monday night his body was found in Goose Creek badly decomposed, his head above water.

The questions for determination require a brief recital of the evidence. Two doctors performed an autopsy with great difficulty since the body was badly swollen and decomposition had begun, particularly about the

head. Dr. Turner said there were bruises on the left side of the face and head; he was of the opinion that marks indicated violence "by blows of some kind," and that death was not due to drowning. He found no fractures of the skull; no cuts, bullet wounds or broken skin, and would not say definitely whether the indicated blows were sufficient to cause death. Both doctors estimated that Jarvis had been dead from three to five days.

Dr. Nichols did not think the bruises on the head and face were sufficient to produce death "in themselves," but found and described blood clots on the head and neck, and blood in the tissues. He was of the opinion that Jarvis was probably dead when he was put into the water. He found no cuts or broken skin.

Several participants in or observers of the poker game testified. The sum and substance of their testimony is that many of the seven or eight persons, including appellant and Jarvis, were drunk or drinking. It was shown that Jarvis had one dollar, and was attempting to get in the game against the wishes of others. The evidence is not clear as to whether Jarvis grabbed his dollar or more money from the table, but it does appear that during the disturbance appellant and Jarvis indulged in what seems to have been a mild fist fight, as one witness says, "Nobody was knocked down." It is testified that while Jarvis and appellant were engaged in the fisticuff, appellant's money, or some money which was on the table, disappeared. It is not shown that he took the money with him, and when his body was recovered no amount of money was found on his person.

The circumstances upon which the commonwealth relied were brought out in testimony by members of the family of Nelson Smith, who lived on the road not far from Goose Creek, and near where the poker game was in progress. A daughter said she was at home on the Friday afternoon, and that between 3 and 4 o'clock a man came up the road from where "they had been playing poker, with a rock in his hand. He came to the back door and asked mother several times if he 'could have a chance,' that Ed Gregory had shot at him." He started away and in climbing a fence fell. Two cars came up and stopped at the gate, one a tan and the other a little blue one. Appellant drove a blue car, and Sams a

chocolate colored one. She said that two were in the tan car. Appellant got out and came to the tan car, and she heard some one say, "I will kill the s. o. b. if I ever lay eyes on him." She said the boy who had first appeared started running through the cornfield, "towards the creek." The tan car and blue car turned and drove back towards the place where they had been playing poker and where the man "had run away from." The witness' mother testifies to about the same facts as did the daughter. She said she later saw the two cars parked "near our cornfield, ten or fifteen minutes after they turned around." Another daughter testified about the same, and added that about ten minutes after the cars turned she heard three shots "down the road towards Manchester." None of these witnesses saw appellant or either of his codefendants go into or come out of the cornfield.

The father (Nelson Smith) was not at home, but learned the facts about the actions of the strange man. On Saturday or Sunday, he and a cousin of deceased, learning of the point where the man had left the premises, searched and found foot prints in the cornfield about 30 yards from the house, and followed them to the bank of the river. They found tracks coming back to the highway into a meadow, and were then lost to sight. He saw a stick which had been picked up by Lane Gibson; "it looked like it had blood stains on it. Afterwards we traced the steps as far as we could; we went up the hill and found some tracks there that led to the cornfield; looked like two men had walked together, a big sign and a smaller sign. We found a blade of fodder; it had bullet holes in it, like they had come from towards the river." On cross-examination he admitted that he did not know whose tracks they were, and that many other persons had been in the field and searched along the river.

Gibson testified that he was around the scene on Tuesday after the body was found on Monday; he and officers were shown where the two cars had been parked after turning at or near the Smith home, and he and they told of tracks, whose they did not know. He found the stick in some weeds near a sawdust pile, which he identified on trial and said when found it had blood

stains on it, and several long black hairs like Jarvis' hair. When testifying, he said the stains, if they were such, were brighter when he found the stick than when exhibited on the trial. The stick, which is exhibited here, is about 4½ feet long and 1¼ by ¾ inches in thickness, and a close observation fails to disclose any indication of dried blood stains, or of hair, which witness thought on trial was moss. On cross-examination he would not say the marks he saw were from blood. The doctors had found no external bleeding.

Ted Woods said he started to the place where the poker game had been in progress. Two cars were parked at the foot of the hill, headed towards Manchester. Appellant came from in front of one car, on the right side, but not out of the cornfield, 15 or 20 feet from where the stick was found. Sams and White were going up the hill, and appellant with a 22 rifle was following them. He said, "You s. o. b.'s if you don't tell me who got my money I am going to kill you." They all went up the hill, and appellant shot several times in the ground. White and Sams had their hands up, saying, "We don't know who got your money." He said he heard a noise in the direction of the cornfield like a man groaning. Reid and appellant got in the car and drove towards Manchester. After he left the hill about 3:45 he passed appellant at his home about three quarters of a mile from Manchester, and saw him next in Manchester, where he was arrested (the same evening) for drunkenness. It is fairly shown in evidence that the man who was groaning was one Turner, who was intoxicated and lying in the weeds. It developed elsewhere in the evidence that either Reid or White told appellant that a boy named Hensley had taken the money from the poker table, and appellant in his testimony says he was so told.

Members of the Corbin Fire Department, in a boat, made search of the river late Monday evening for Jarvis' body. Some four or five were introduced to testify on the manner of search and result. During the testimony of some of them it developed that they had discovered the body, but did not at once undertake its removal. Asked why, they said that when they were searching they saw three men in a boat who they thought were following them, and they were afraid that these

men "would shoot them from the bushes." Appellant's objection to the latter portion of the testimony was overruled and complaint is made of the ruling. We pause to say that it is apparent that what these witnesses said about being followed, and their fears, was incompetent without a showing of who the "other men" were. It was brought in ostensibly for prejudicial purpose.

The foregoing is as much of the commonwealth's testimony as reasonable time and space will justify. Appellant testifed in his behalf, his testimony covering about 34 pages of typewriting, 14 or 15 being of close cross-examination. He denied that he had gone into the cornfield, or had seen Jarvis after he left the poker game. He testified frankly as to his turning his car at or near the Smith house, and meeting Sams and White after they had turned and reached the point near where the poker game had been in progress. He says he suspected those two of having taken his money, or knowing who had taken it, and had fired his 22 rifle several times to carry "out his bluff," and that he was told that some person other than Jarvis had taken it.

He testified that after this episode he got in his car and drove to his home or place of business in or near Manchester, and was arrested for drunkenness about 3:30 and placed in jail where he remained until the following morning. This testimony is corroborated by police officers. He said when he left the poker game he knew that Jarvis did not have his money, and he did not learn of the disappearance of Jarvis until he was arrested on the homicide charge.

On the main point the court concludes that the testimony fails to connect appellant sufficiently with the commission of the homicide. It is close, but there are many weak points. Without citing cases for comparative purposes, it is sufficient to say that we are of the opinion that the court should have granted appellant's motion for peremptory, which should be done if on another trial the evidence is the same or not more convincing.

Since a new trial will no doubt follow, it is proper to say something of the instructions. It is not necessary to set them out in detail. It is apparent that the court took as a pattern the form and substance of the eight laid down in Stanley's Instructions to Juries, No. 869.

which were taken bodily from Saylor v. Com., 210 Ky. 796, 276 S. W. 841.

Counsel for appellant is incorrect in contending that since the indictment did not charge conspiracy, no instructions on that point should have been given. We have held that such an instruction may be given, notwithstanding the indictment does not charge conspiracy, if the proof warrants. Ray v. Com., 230 Ky. 656, 20 S. W. 2d 484, 66 A. L. R. 1297. An examination of the Saylor case shows, first there was sufficient proof to have justified an instruction on conspiracy, and such as to warrant an instruction that if the jury believed that appellant first brought on the difficulty he should not have benefit of his plea of self-defense. This (No. 7) also told the jury that if they believed from the evidence beyond a reasonable doubt that a conspiracy existed and the homicide occurred in furtherance, etc., he was to be deprived of the plea. What we mean to say is that the proof here was not sufficient to warrant any instruction on conspiracy, or reference to it, or an instruction on the question as to who brought on the difficulty. These should be given only if on another trail the evidence justifies the giving. We have held it to be error to give an instruction on conspiracy if the proof, or circumstances shown, were not sufficient to show or to create a reasonable inference that such existed. Lockard v. Com., 193 Ky. 619, 237 S. W. 26.

Because of the conclusions above expressed, we are of the opinion that sufficient errors are shown to require a reversal and remand for new trial consistent herewith. Any questions not discussed or decided are reserved.

Judgment reversed.